(35 P.3d 936)

No. 85,260

STATE OF KANSAS, *Appellee*, v. JESSE JOSEPH VILLANUEVA, JR., *Appellant.*

Opinion filed December 7, 2001.

*Peter Maharry*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*James L. Spies*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before GERNON, P.J., KNUDSON and BEIER, JJ.

KNUDSON, J.: Jesse Joseph Villanueva, Jr. appeals his conviction for the rape of S.M., contending the trial court erred in admitting

opinion testimony of a social worker, failing to give a multiple acts instruction, and permitting prosecutorial misconduct that was prejudicial.

We affirm. The errors committed during Villanueva's trial are harmless and did not impair his right to a fair trial.

S.M. and Villanueva were lovers. The State's theory was that after S.M. decided to end the relationship there was a violent quarrel, and Villanueva raped her. Villanueva acknowledges the quarrel but denies raping S.M. This is the second trial, with the first ending when the jury was unable to reach agreement. Additional facts will be discussed as necessary under each of the issues raised on appeal.

### Expert Opinion Testimony

Michele Paynter is a social worker employed as a clinical coordinator for the Metropolitan Organization to Counsel Sexual Assault (MOCSA) located in Kansas City, Missouri. Her duties include supervision of other social workers and individually working with victims of rape.

After the first trial ended in a hung jury, the State moved to endorse Paynter as an expert witness regarding rape trauma syndrome and to further testify regarding the content of S.M.'s clinical file maintained at MOCSA. After the rape, S.M. received counseling services from Shannon Hobbs, a social worker employed by MOCSA. Paynter was Hobbs' supervisor at MOCSA. At the time of the second trial, Hobbs no longer worked for MOCSA. During the period of time MOCSA provided counseling services to S.M., Michele Paynter had no direct contact with her.

Villanueva filed a motion in limine, arguing Paynter was not qualified to testify as an expert witness regarding rape trauma syndrome. The trial court agreed and also specifically ruled Paynter would not be allowed to testify as to the signs and symptoms of the syndrome. However, the court further ruled, under the business records exception to the hearsay rule, Paynter would be allowed to testify as to the content of S.M.'s clinical file. Inexplicably, the trial court's order was not followed when Paynter testified before the jury.

The following are excerpts of Paynter's testimony on direct examination:

"Q. . . . [W]hat is your educational background?

"A. I have a Bachelor in Social Work and I have some post graduate work in clinical psych.

. . . .

"Q. In order to be a licensed clinical social worker, is it necessary for you to have a masters or a post bachelor degree?

"A. No. You can get licensure on a bachelor level as well.

"Q. Okay. Do you have that license?

"A. No, I do not.

. . . .

"Q. . . . In your training and experience, have you learned what symptoms are common in a woman who has been the victim of a rape?

"A. Yes, sir.

. . . .

"Q. . . . Are you—you're—fair to say you're not qualified to diagnose [victims of rape] with any—

"A. No, I do not do that.

"Q. —psychological disorders?

"A. Right.

"Q. Okay.

"A. But I keep a DSM 4 handy.

. . . .

"Q. . . . In the—in the course of your employment [at] MOCSA and your years in seeing clients and your years of training, have you—are you able to say if there is a *common set of symptoms or behavior that is displayed by a victim of rape?*

"A. Yes, I—I can say that.

"Q. Can you describe some of those characteristics to the jury?

"A. Yes. They vary of course from individual to individual, but many of the symptoms that I have seen and are clinically researched include depression, displacement of anger, self blame, some self-destructive patterns which may include alcohol abuse, promiscuity, self-mutilation, even manifestation of eating disorders.

. . . .

"Q. . . . The list of symptoms you just described, is it fair to say that is not a comprehensive list?

"A. It is fair to say that.

"Q. Okay.

"A. This is [an] overall diagnosis for those symptoms, but as the defense attorney has already eluded to, I am not able to make that diagnosis.

"Q. Okay. And, in fact, you have not diagnosed [S.M.] with anything, have you?

"A. I have never diagnosed any of my clients.

"Q. Okay. Great. In your—in the treatment of [S.M.] at MOCSA, was it documented whether she displayed any of those classic characteristics of a victim of rape?'

"A. Yes, it was.

"Q. Specifically what?

"A. Shall I read this?

"Q. Please.

"A. Okay. This was an assessment given by Ms. Hobbs. At the end of each month, as clients see the specialist, we are to assess what their overall impact is and what their impressions were in those sessions. Every week that specialist sees [S.M.], she appears to be more depressed. Appears is the operative word that keeps us from being legal trouble. She has been to court one time and is nervous with the upcoming court confrontations with her alleged rapist.

She states that she cries a lot and even with the help of medication, she is having difficulty with her seeming depression. [S.M.] has many feelings that she wants to work on and she states that once she resolves some work—that once she resolves some of her issues, she knows that she will feel better. However, [S.M.] still seems scared to explore some of those feelings. At the end, the intervention specialist identifies that she will continue the cognitive process which is the modality that we follow in my department and it is an offset of Dr. Albert Ellis' (ph) work on rationally motive therapy.

"Q. Okay. That's a lot of big, big words.

"A. Right.

"Q. I'll admit I don't understand all of it.

"A. Basically it's looking at the maladaptive thinking patters that trauma victims can possibly have after a trauma.

"Q. Okay. And that type of thinking—those thinking patterns are present in [S.M.]?

"A. Yes.

"Q. Okay.

"A. As it appears here.

"Q. And anything else that stands out about [S.M.]'s behavior or—

"A. In essence so as not to read verbatim here, it appears that Ms. Hobbs wrote about some possible avoidant behavior and by that I mean many times trauma victims will express anxiety in coming to these crisis intervention counseling sessions and so they may not show without any call to the person with whom they are interacting and that is very, very common.

"Q. Okay. Anything else that stands out to you as important for the jury to know?

"A. Just an ongoing identification of depression—

"Q. Okay.

"A. —and denial.

"Q. Thank you.

"A. Those two things.

"Q. Denial of what?

"A. Denial that this alleged violation really in fact happened to her and that is very, very common with rape victims. I can't believe that this happened to me." (Emphasis added.)

The use of expert testimony at trial is controlled by K.S.A. 60-456. In order to testify as an expert, a witness must be skilled or experienced in the field to which the subject relates. *State v. McClain*, 216 Kan. 602, 606, 533 P.2d 1277 (1975). Whether a witness is qualified as an expert is left to the sound discretion of the trial court. *State v. Colwell*, 246 Kan. 382, Syl. ¶ 7, 790 P.2d 430 (1990).

In determining whether the trial court erred, we find instructive *State v. Willis*, 256 Kan. 837, 888 P.2d 839 (1995).

Willis was convicted of rape, and the issue on appeal was whether the trial court erred in admitting expert testimony from a licensed social worker that the victim suffered from post-traumatic stress disorder and rape trauma syndrome. At trial, Ruth Durham, the alleged victim's outpatient therapist from a mental health center, testified the victim's behavior was consistent with rape trauma syndrome and that the victim suffered from post-traumatic stress disorder.

The Supreme Court concluded the trial court abused its discretion in permitting Durham to give expert testimony regarding rape trauma syndrome. In its opinion reversing Willis' conviction, the court stated:

"While Ruth Durham was eminently qualified as a social worker, having been licensed by the behavioral sciences regulatory board, her background, experience, and licensure did not qualify her to diagnose medical and psychiatric conditions such as post-traumatic stress disorder.

"[F]or a witness to qualify as an expert on post-traumatic stress disorder and rape trauma syndrome, the witness must possess special training as an expert in that field of psychiatry. Such testimony should be limited to experts with training in the field of post-traumatic stress disorder and rape trauma syndrome and possessing the professional qualifications to make appropriate diagnoses thereof. A clinical social worker with a masters degree in social work falls well below that mark." 256 Kan. at 846-47.

Also helpful to our analysis is *State v. Reser*, 244 Kan. 306, 767 P.2d 1277 (1989). At trial, Helen Swan, a licensed social worker,

testified for the State. Swan evaluated the alleged victim on two different dates for a total of about 4 hours. There was no question but that Swan was a recognized expert in child sexual abuse cases. Justice Herd, writing for the court, summarized Swan's testimony as follows:

"Swan did not use the term post-traumatic stress syndrome before the jury, but testified that children who are sexually abused tend to report fairly consistent symptoms or common patterns of behavior resulting from the trauma. She noted children seldom report sexual abuse immediately, 'particularly within family situations.' The great majority 'tend to keep it inside because they think it will go away or they don't want to embarrass people or they don't want to embarrass themselves.'

"Swan testified she had sufficient data to form an opinion as to whether the victim showed symptoms consistent with sexual abuse. She was of the opinion the victim exhibited behavior consistent with a child who had been sexually abused.

"While the briefs of both parties leave the impression Swan testified the victim suffered from post-traumatic stress syndrome or rape trauma syndrome, that did not occur. The record is clear that Swan testified only as to traits and patterns common to victims of sexual child abuse and that the victim exhibited some of these traits. She did not go into an explanation of the post-traumatic stress syndrome, nor did she try to narrow it to rape trauma syndrome." 244 Kan. at 308-09.

Here, Paynter was not licensed nor did she have a master's degree. We acknowledge she did have considerable practical experience in counseling rape victims. At trial, she was portrayed as having expert credentials and permitted to testify as to the signs and symptoms common to rape trauma syndrome notwithstanding the trial court's pretrial ruling.

Paynter's testimony went far beyond providing the jury with S.M.'s statements and demeanor during counseling sessions with the absent social worker Shannon Hobbs.

Paynter testified she was not qualified to diagnose the psychological disorders of rape victims but informed the jury she kept a diagnostic manual handy; she then proceeded to tell the jury there were common signs and symptoms displayed by rape victims. Finally, she volunteered there was an overall diagnosis for those symptoms, but "as the defense attorney has already eluded to, I am not able to make that diagnosis." Paynter then went to S.M.'s

counseling records to establish whether S.M.'s signs and symptoms shared the characteristics of a rape victim.

In our opinion, Paynter's testimony is analogous to stating: "If it walks like a duck, quacks like a duck, and has feathers like a duck, you the members of the jury must decide what it is because I'm not allowed to tell you." Under the totality of circumstances, we believe the factual pattern in this appeal is more akin to *Willis* than to *Reser*. Paynter did not have the professional qualifications to render a medical diagnosis and should not have been allowed to give diagnostic testimony while informing the jury with a wink and a nod she was precluded from naming the disorder. Additionally, we find troubling the overruling of Villanueva's timely objections to Paynter's testimony notwithstanding the objections were consistent with the pretrial rulings. We hold the trial court erred in not curtailing Paynter's testimony.

### *Prosecutorial Misconduct*

Villanueva argues the State engaged in prosecutorial misconduct when the prosecutor made the following comments during closing rebuttal: "The funny thing is that's not the—that's not the only rape that took place in this case. The second rape . . . took place when she had to come in here and had her character attacked and her memory attacked."

Villanueva objected, and the court directed the State to move onto another topic.

Before turning to an analysis of the issue, we briefly will comment upon the trial court's tepid response to "move on." The court's response is ambiguous and falls far short of sustaining the defendant's objection. Moreover, the court clearly did not instruct the jury to disregard the statements. We conclude, if the prosecutor's statements were improper, the trial court's retort was not sufficient to cure the error. See *State v. Magdaleno*, 28 Kan. App. 2d 429, 437, 17 P.3d 974, *rev. denied* 271 Kan. 1040 (2001).

The standard of appellate review as to an issue of prosecutorial misconduct in closing argument is:

"The analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process. First, the appellate court determines whether the

remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that in criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Second, the appellate court must determine whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, requiring reversal. [Citations omitted.]" *State v. McCorkendale*, 267 Kan. 263, 278-79, 979 P.2d 1239 (1999).

Additionally, "K.S.A. 60-261 imposes a duty on the trial court to protect a defendant's right to a fair trial. The trial court is required to prevent prosecutorial misconduct from occurring regardless of whether a timely objection has been lodged to the improper conduct." *State v. Holmes,* 272 Kan. 491, Syl. ¶ 2, 33 P.3d 856 (2001).

The State acknowledges in its written brief that trial counsel's remarks were ill considered, stating:

"The State acknowledges that the prosecutor used a poor choice of words to make a legitimate point. The State wanted the jury to consider S.M.'s testimony in light of the vigorous cross-examination by [defendant's attorney]. The comments were intended to bolster the credibility of S.M. by pointing out her calm under pressure. The comments were not intended to disparage [defendant's attorney] nor the defendant. However, this point was never made."

We conclude the prosecutor's remarks were not only intemperate but an explicit appeal to the prejudices of jurors. The more substantial question is whether the statements, considered under the totality of circumstances, denied Villanueva a fair trial.

"When determining whether prosecutorial misconduct was prejudicial, factors that should be considered include: (1) Is the misconduct so gross and flagrant as to deny the accused a fair trial? (2) Do the remarks show ill will on the prosecutor's part? (3) Is the evidence against the defendant of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors? [Citation omitted.]" *State v. Perrigo*, 10 Kan. App. 2d 651, 654, 708 P.2d 987 (1985).

Our review of the evidentiary trial proceedings, including the jury instructions, persuades us the prosecutor's remarks did not deny Villanueva a fair trial. Ill will is not evident. Indeed, in arguing the defendant's motion for new trial, his attorney acknowledged he did not believe the prosecutor made the comments with any intent to disparage counsel. Finally, the evidence against Villanueva is so

substantial that the misconduct would likely have had little, if any, weight in the minds of jurors.

### Failure to Give Unanimity Instruction

Villanueva argues his right to a unanimous verdict was violated because the State presented evidence of digital and penile penetration and no unanimity instruction was given. As Villanueva did not request the instruction, we review under a clearly erroneous standard. See *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995).

This issue is without merit for two reasons. The underlying facts support a conclusion Villanueva's attack on S.M. was one continuous event. Thus, no multiple acts instruction is required. See *State v. Staggs*, 27 Kan. App. 2d 865, Syl. ¶ 2, 9 P.3d 601, *rev. denied* 270 Kan. 903 (2000).

Additionally, in *State v. Hill*, 271 Kan. 929, Syl. ¶ 3, 26 P.3d 1267 (2001), affirming 28 Kan. App. 2d 28, 11 P.3d 506 (2000), the Supreme .Court held that a two-step analysis must be applied to determine whether the failure to give a unanimity instruction resulted in harmless error. First, there must be a determination of whether the jury could have been confused or if the record indicates the presence of legally or factually separate incidents. A legally separate incident is one in which the defendant presents different defenses to different facts. A factually separate incident is when independent crimes occur at different times or a later crime is motivated by a "fresh impulse." In the present case, there is no indication the jury was confused. Also, Villanueva did not present different defenses to the different types of penetration, and the acts were not factually separate. Here, just as in *Hill*, the jury rejected Villanueva's general denial of all acts and accepted S.M.'s version. Under these circumstances, the failure to give a unanimity instruction does not constitute prejudicial error.

### Cumulative Error

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule,

however, if the evidence is overwhelming against the defendant.' *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992)." *State v. Bedford*, 269 Kan. 315, 332-33, 7 P.3d 224 (2000).

Although we have held error did occur in Villanueva's trial, we do not believe, under the totality of circumstances, that the error cumulatively caused any undue prejudice. The evidence of Villanueva's guilt is strong and persuasive. His testimony at trial was inconsistent and substantially discredited. Social worker Paynter's expert testimony went too far because she was not properly qualified as a psychiatric witness. However, it does appear she was qualified by training and experience to testify as to common patterns of behavior shown by rape victims and that S.M. exhibited some of that behavior during counseling. Finally, for the reasons previously stated, we do not believe the limited statements made by the prosecutor in closing argument, although inappropriate, had any effect on the jury's determination of Villanueva's guilt or innocence. We conclude that although Villanueva did not receive a perfect trial, he did receive a fair trial, and the underlying conviction of rape should not be reversed.

Affirmed.