No. 85,260

STATE OF KANSAS, *Appellee*, v. JESSE JOSEPH VILLANUEVA, JR., *Appellant.*
(49 P.3d 481)

Opinion filed July 12, 2002.

*Peter T. Maharry*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*James L. Spies*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: Following two trials in the Wyandotte County District Court, Jesse Joseph Villanueva, Jr., was convicted by a jury of raping his former girlfriend S.M. on November 15, 1998. Villanueva's first trial ended in a hung jury. After the second jury convicted Villanueva of one count of rape, the trial court sentenced Villanueva to 254 months in the custody of the Secretary of Corrections.

Villanueva appealed his conviction, asserting error in: (1) the admission of testimony of social worker Michele Paynter on symptoms of rape trauma syndrome; (2) failure to provide a unanimity instruction; (3) that prosecutorial misconduct resulted in a denial of a fair trial; and (4) that cumulative trial errors warranted reversal of his conviction. The Court of Appeals affirmed Villanueva's conviction on December 7, 2001, and found that the trial court erred

in allowing Paynter's testimony and that the prosecutor's remarks were intemperate and explicitly appealed to the prejudices of jurors, but held that the errors were harmless and did not impair Villanueva's right to a fair trial. See *State v. Villanueva*, 29 Kan. App. 2d 1056, 35 P.3d 936 (2001).

We granted Villanueva's petition for review of the Court of Appeals' decision. On review, Villanueva limits his claims of error to the admission of Paynter's testimony and prosecutorial misconduct during closing argument.

S.M. testified that she met Villanueva at a Kansas City bar in October 1997. They dated for approximately 1 year. S.M. said they had a sexual relationship during that time period and occasionally loaned each other money. At the time S.M. ended the relationship, she said she owed Villanueva $140, but according to Villanueva she owed him approximately $450. Both agreed that Villanueva went to S.M.'s house the morning of November 15, 1998; however, Villanueva and S.M. offered vastly different versions of the events following his arrival.

Villanueva testified that he went to S.M.'s house on November 15, 1998, to discuss the money S.M. owed him. According to Villanueva, he had approached S.M. about the money the night before at the bar, but S.M. told him she did not want to talk about it then. S.M. told him to contact her the next day. Villanueva stated that he drove his mother's car to S.M.'s house the next morning, knocked on the door, and S.M. opened the door and told him to come in. Villanueva testified that he said, "I got court Thursday and I figured if you had money to go out drinking, that maybe you could pay me some of the money you owe me." Villanueva said that made S.M. upset, and they began arguing. S.M. asked who he was dating and if he was sleeping with her. Villanueva responded, "[Y]es, and it's twice as good as it was with you. So what?" S.M. slapped him. After telling S.M. to settle down, the argument continued when Villanueva called her a freak. According to Villanueva, S.M. said, "I'll show you freak," and, "I can't believe you raped me." Villanueva went to the bathroom. When he came out, S.M. was not there, so he left. Later, Villanueva saw police cars at S.M.'s

house as he drove by, and it dawned on him that she was accusing him of rape.

S.M. told a completely different story. S.M. testified that after they broke up in October, Villanueva repeatedly called her and came to her work and school to talk about their relationship. S.M. testified that the night before the incident, Villanueva approached the table at the bar where she was sitting, but she stood up and left without speaking to Villanueva. S.M.'s son was spending the night with his aunt but came by at 8:30 a.m. to gather some clothes. S.M. said that after her son left, she went back to bed. The doorbell rang again and S.M. opened the door, saw Villanueva, and asked him what he wanted. According to S.M., after she let Villanueva in, he approached her asking why she was so mean to him the night before and why she would not talk to him. S.M. testified that she told him to back off, but at that point he grabbed her and forced her to the floor. S.M. said as she struggled with Villanueva she screamed for him to stop, but he said she "owed him." S.M. stated she twined her legs together, but said Villanueva pulled them apart and raped her. S.M. said after he finished, Villanueva let her get up and she put her pants on. Villanueva stayed around as if nothing had happened, pleading with her about their friendship. According to S.M., she told him "friends don't rape each other," and he responded by stating, "I didn't rape you." When Villanueva went to the bathroom, S.M. said she ran for the door and went to her neighbor's house to call the police.

S.M. was taken by police to the University of Kansas Medical Center for treatment. Dr. Pamela McCoy and nurse Angela Zeeb performed a rape examination on S.M. McCoy noted multiple abrasions, bruises, and scratches on S.M.'s right cheek and left breast and bruises on the insides of both thighs in a fingerprint pattern consistent with someone forcing her legs open. McCoy testified the bruises were fresh. S.M. also had a scratch on her right labia and general redness around her vaginal area. McCoy stated that she noticed a yellow substance or exudate in S.M.'s vagina. On cross-examination, McCoy noted that the yellow exudate could be related to a bacterial infection or vaginal irritation and admitted it was possible that a woman with a vaginal irritation could scratch

herself in her sleep and not even know it. KBI testing of the vaginal swabs taken during the rape examination of S.M. was negative for semen or seminal fluid.

Officers arrested Villanueva, chasing him down by foot after he attempted to escape by running from the officers. After he was in custody, Villanueva gave varying stories to Detective Michael York, but when Villanueva's behavior became increasingly strange, York ended the interview. The next day, the State charged Villanueva with one count of rape.

The first jury trial took place in October 1999. According to Villanueva, the State did not present evidence concerning rape trauma syndrome at the first trial. After deliberation, the jury returned to the court and advised the court it could not reach a unanimous decision and that further deliberation would not be of benefit. The foreman advised the court that the jurors' vote was 10 to 2, but following the court's instruction, did not indicate which way jurors had voted. The trial court declared a mistrial due to a hung jury.

Prior to Villanueva's second trial at a motion hearing in January 2000, the assistant district attorney advised the court that he intended to offer testimony of Paynter on rape trauma syndrome. Paynter was an unlicensed social worker who worked as a supervisor at the Metropolitan Organization to Counsel Sexual Assault (MOCSA) in Kansas City, Missouri. Defense counsel argued that because the witness had no personal knowledge or involvement in the therapy sessions, her testimony was inadmissible hearsay and prejudicial.

The assistant district attorney conceded that the witness was not qualified to make a diagnosis of rape trauma syndrome, but asserted she would qualify as an expert on rape trauma syndrome, its symptoms, and what S.M. disclosed during therapy sessions. The State advised the court that the therapist who treated S.M. was unavailable, but that as a supervisor Paynter was intimately knowledgeable about the facts of the case due to her follow-up with clients and review of records during the normal course of her duties.

Judge J. Dexter Burdette, of the Wyandotte County District Court, ruled that under the business records exception to the hearsay rule, Paynter could "certainly testify what the victim disclosed to her therapist about this incident," but would not be allowed to testify about rape trauma syndrome. Ultimately, the trial court concluded:

"I don't know that there are gonna be any diagnoses testified to, but certainly what the victim told the therapist and this woman who was her supervisor who apparently aided in her treatment by supervising the—the therapist and was made privy apparently of these conversations through the normal course of her work and produced business records that reflected that participation, the information contained in those records is admissible and she may testify to them after the foundation has been established."

There is no indication that the trial court decided at that time that Paynter qualified as an expert. It seems the trial court simply ruled she could testify concerning the information contained in the MOCSA business records.

During the second trial, Villanueva's counsel again objected to Paynter's testimony, based on Paynter's lack of personal knowledge of the contents of the counseling records. The trial court again ruled that the information contained in the MOCSA records was admissible under the business records exception and allowed Paynter to testify.

As the State began its direct examination of Paynter, defense counsel objected to her qualifying as any type of expert witness on the basis that she did not have the requisite educational background. The State responded that Paynter would "not be mentioning a word [about] rape trauma syndrome" or discussing a diagnosis, but would "say these are common symptoms and these are the symptoms that [S.M.] displayed." The trial court indicated that the State needed more foundation as to Paynter's experience in counseling rape victims. Ultimately, the trial court allowed the State to continue its examination of Paynter despite defense counsel's objections.

The Court of Appeals found the following excerpts of Paynter's testimony on direct examination noteworthy:

"Q. . . . [W]hat is your educational background?

"A. I have a Bachelor in Social Work and I have some postgraduate work in clinical psych.

. . . .

"Q. In order to be a licensed clinical social worker, is it necessary for you to have a masters or a post bachelor degree?
"A. No. You can get licensure on a bachelor level as well.
"Q. Okay. Do you have that license?
"A. No, I do not.

. . . .

"Q. . . . In your training and experience, have you learned what symptoms are common in a woman who has been the victim of a rape?
"A. Yes, sir.

. . . .

"Q. . . . Are you—you're—fair to say you're not qualified to diagnose [victims of rape] with any—
"A. No, I do not do that.
"Q. —psychological disorders?
"A. Right.
"Q. Okay.
"A. But I keep a DSM 4 handy.

. . . .

"Q. . . . In the course of your employment [at] MOCSA and your years in seeing clients and your years of training, have you—are you able to say if there is a *common set of symptoms or behavior that is displayed by a victim of rape?*
"A. Yes, I—I can say that.
"Q. Can you describe some of those characteristics to the jury?
"A. Yes. They vary of course from individual to individual, but many of the symptoms that I have seen and are clinically researched include depression, displacement of anger, self blame, some self-destructive patterns which may include alcohol abuse, promiscuity, self-mutilation, even manifestation of eating disorders.

. . . .

"Q. The list of symptoms you just described, is it fair to say that is not a comprehensive list?
"A. It is fair to say that.
"Q. Okay.
"A. This is [an] overall diagnosis for those symptoms, but as the defense attorney has already [alluded] to, I am not able to make that diagnosis.
"Q. Okay. And, in fact, you have not diagnosed [S.M.] with anything, have you?
"A. I have never diagnosed any of my clients.
"Q. Okay. Great. In your—in the treatment of [S.M.] at MOCSA, was it documented whether she displayed any of those classic characteristics of a victim of rape?
"A. Yes, it was.
"Q. Specifically what?

"A. Shall I read this?

"Q. Please.

"A. Okay. This was an assessment given by Ms. Hobbs. At the end of each month, as clients see the specialist, we are to assess what their overall impact is and what their impressions were in those sessions. Every week that specialist sees [S.M.], she appears to be more depressed. Appears is the operative word that keeps us from being [in] legal trouble. She has been to court one time and is nervous with the upcoming court confrontations with her alleged rapist.

"She states that she cries a lot and even with the help of medication, she is having difficulty with her seeming depression. [S.M.] has many feelings that she wants to work on and she states that once she resolves some work—that once she resolves some of her issues, she knows that she will feel better. However, [S.M.] still seems scared to explore some of those feelings. At the end, the intervention specialist identifies that she will continue the cognitive process which is the modality that we follow in my department and it is an offset of Dr. Albert Ellis' work on [rational emotive] therapy.

"Q. Okay. That's a lot of big, big words.

"A. Right.

"Q. I'll admit I don't understand all of it.

"A. Basically it's looking at the maladaptive thinking patterns that trauma victims can possibly have after a trauma.

"Q. Okay. And that type of thinking—those thinking patterns are present in [S.M.]?

"A. Yes.

"Q. Okay.

"A. As it appears here.

"Q. And anything else that stands out about [S.M.]'s behavior or—

"A. In essence so as not to read verbatim here, it appears that Ms. Hobbs wrote about some possible avoidant behavior and by that I mean many times trauma victims will express anxiety in coming to these crisis intervention counseling sessions and so they may not show [up] without any call to the person with whom they are interacting and that is very, very common.

"Q. Okay. Anything else that stands out to you as important for the jury to know?

"A. Just an ongoing identification of depression—

"Q. Okay.

"A. —and denial.

"Q. Thank you.

"A. Those two things.

"Q. Denial of what?

"A. Denial that this alleged violation really in fact happened to her and that is very, very common with rape victims. I can't believe that this happened to me." (Emphasis added.) 29 Kan. App. 2d at 1060.

Paynter later testified that Shannon Hobbs, the MOCSA intervention specialist who actually counseled S.M., only had a bachelor's degree in social work at that time. Paynter did not indicate whether Hobbs was licensed.

Following a 3-day trial, jurors found Villanueva guilty of one count of rape. On February 2, 2000, the trial court sentenced Villanueva to 254 months' presumptive imprisonment and 36 months' postrelease supervision.

Villanueva maintained on appeal to the Court of Appeals that the trial court erred in admitting the testimony of Paynter on the symptoms of rape trauma syndrome and by failing to provide a unanimity instruction. In addition, Villanueva contended that prosecutorial misconduct resulted in a denial of a fair trial and contended that cumulative trial errors merited reversal of his conviction.

The Court of Appeals affirmed Villanueva's conviction, despite finding that the trial court erred in allowing Paynter's testimony and that the prosecutor's intemperate remarks explicitly appealed to the prejudices of jurors. The Court of Appeals held that the errors were harmless and did not impair Villanueva's right to a fair trial.

Villanueva filed a timely petition for review on January 7, 2002. On March 19, 2002, this court considered and granted Villanueva's petition for review. Here, he maintains that the erroneous admission of Paynter's testimony and prosecutorial misconduct recognized by the Court of Appeals merit reversal of his conviction. This court has jurisdiction under K.S.A. 60-2101(b) and K.S.A. 20-3018(b) to review the Court of Appeals' decision, and the matter is ripe for review.

On review, Villanueva's first contention is that the trial court erred in allowing testimony concerning rape trauma syndrome and that the admission of this evidence was not harmless.

" 'The admission and exclusion of evidence lies within the sound discretion of the trial court.' [Citation omitted.] ' " '[I]t is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion.' " ' [Citations omitted.] Judicial discretion is abused only when no rea-

sonable person would take the view adopted by the trial court. [Citation omitted.]" *State v. Leitner*, 272 Kan. 398, 408, 34 P.3d 42 (2001).

Villanueva contends the admission of Paynter's testimony was improper for two reasons. First, Villanueva states that the testimony concerning rape trauma syndrome presented by Paynter would only be relevant if the State could show S.M. actually suffered from rape trauma syndrome. Villanueva contends that the State did not show that S.M. suffered from the syndrome and, thus, he argues that Paynter's testimony concerning the symptoms of the syndrome lacked relevancy.

Second, Villanueva maintains that the Court of Appeals failed to properly apply the harmless error rule. Villanueva states that the Court of Appeals correctly found that Paynter's testimony was nothing more than a diagnosis, even though Paynter "with a wink and a nod" did not specifically state S.M. suffered from rape trauma syndrome. He contends, however, that the Court of Appeals erred in concluding that the admission of the testimony did not cause him prejudice.

The State argued to the Court of Appeals that Paynter did not testify that S.M. had been diagnosed with rape trauma syndrome, but only testified about patterns of behavior commonly seen in victims of rape. According to the State, Paynter's testimony was relevant and admissible "to show that S.M. suffered from many problems often experienced by rape victims."

## 1. Relevancy

Villanueva's first argument is that the trial court abused its discretion by allowing Paynter's testimony concerning the symptoms of rape trauma syndrome because testimony concerning such symptoms was irrelevant.

"Except as otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. [Citations omitted.] K.S.A. 60-401(b) defines relevant evidence as 'evidence having any tendency in reason to prove any material fact.' " *Leitner*, 272 Kan. at 412.

Prior to Paynter's direct examination, Villanueva's counsel objected to allowing her testimony, based on Paynter's lack of personal knowledge, stating:

"[O]ur objection is based on the fact that the contents of the documents are subject to the impressions of individuals that have been written down and not in this courtroom or not—were not cross-examined on evidence on any issue that's written down or on their perception and their ability to perceive on their education on anything. And that is not permitted under our rules of evidence."

The trial court ruled that the information contained in the MOCSA records was admissible under the business records exception and allowed Paynter to begin testifying. Villanueva's trial counsel again objected to Paynter's testimony on the basis that she did not have the requisite educational background to qualify as an expert witness. Defense counsel did not object that the testimony was irrelevant, however.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404.

Villanueva objected to the admission of Paynter's testimony based on the prohibition against hearsay and on the witness' lack of qualifications. When a defendant objects to the introduction of evidence at trial but fails to state a specific ground for objection, the issue is not preserved for appeal. See *State v. Valdez*, 266 Kan. 774, 789, 977 P.2d 242 (1999); *State v. Johnson*, 266 Kan. 322, 335-36, 970 P.2d 990 (1998); *State v. Cooper*, 252 Kan. 340, 349, 845 P.2d 631 (1993). Because Villanueva did not object to the trial court that the evidence lacked relevancy, we will not consider his argument for the first time on appeal.

## 2. Harmless Error

Villanueva's second contention in regard to the admission of Paynter's testimony is that the Court of Appeals did not explicitly "spell out" the harmless error standard it employed and incorrectly failed to consider whether the erroneous admission of her testimony had little, if any, likelihood of changing the result of the trial.

The State maintained to the Court of Appeals that the trial court did not err in admitting Paynter's testimony. The Court of Appeals held, however, that the trial court erred in not curtailing Paynter's testimony because it "went far beyond providing the jury with S.M.'s statements and demeanor during counseling sessions." 29 Kan. App. 2d at 1061. The Court of Appeals stated:

"In our opinion, Paynter's testimony is analogous to stating: 'If it walks like a duck, quacks like a duck, and has feathers like a duck, you the members of the jury must decide what it is because I'm not allowed to tell you.' . . . Paynter did not have the professional qualifications to render a medical diagnosis and should not have been allowed to give diagnostic testimony while informing the jury with a wink and a nod she was precluded from naming the disorder." 29 Kan. App. 2d at 942.

Villanueva asserts that the Court of Appeals did not apply the harmless error analysis when it concluded that "under the totality of the circumstances, [it did not believe] that the error cumulatively caused any undue prejudice." Villanueva argues that under *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998), the Court of Appeals should have found the erroneously admitted evidence inconsistent with substantial justice or should have considered its admission likely to have changed the result of the trial.

"Review of the admission or the exclusion of evidence is usually governed by the harmless error rule. K.S.A. 60-261 provides that no error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Leitner*, 272 Kan. 399, Syl. ¶ 7.

## The Court of Appeals found:

"Here, Paynter was not licensed nor did she have a master's degree. We acknowledge she did have considerable practical experience in counseling rape victims. At trial, she was portrayed as having expert credentials and permitted to testify as to the signs and symptoms common to rape trauma syndrome notwithstanding the trial court's pretrial ruling.

"Paynter's testimony went far beyond providing the jury with S.M.'s statements and demeanor during counseling sessions with absent social worker Shannon Hobbs.

. . . .

". . . We hold the trial court erred in not curtailing Paynter's testimony." 29 Kan. App. 2d at 1062.

Villanueva argues that the rape trauma syndrome evidence was inconsistent with substantial justice because it "clearly affected his right to a fair trial." "A 'fair trial,' as the term is applied to judicial proceedings, anticipates the right to object to the admission of evidence, cross-examine the witnesses and rebut the evidence introduced." *Kincaid v. Wade*, 196 Kan. 174, 177, 410 P.2d 333 (1966). The right to a fair trial includes the presumption of innocence, the right to establish a defense, and the right to assistance of counsel. See *Estelle v. Williams*, 425 U.S. 501, 503, 48 L. Ed. 2d 126, 96 S. Ct. 1691 (1976) (discussing the presumption of innocence); *Washington v. Texas*, 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (1967) (noting that due process of law gives an accused the right to confront witnesses and to establish a defense); *State v. Wallace*, 258 Kan. 639, 651, 908 P.2d 1267 (1995) (holding that a fair trial includes the right to assistance of counsel).

Here, the erroneous admission of Paynter's testimony did not rise to the level of violating Villanueva's right to a fair trial. Villanueva was not denied the opportunity to cross-examine adverse witnesses, to present a defense, representation of counsel, or the presumption of innocence.

Therefore, it is necessary to proceed to the second prong of the *Donesay* test. We must determine whether the erroneous admission of Paynter's testimony "had little, if any, likelihood of having changed the result of the trial." 265 Kan. at 88.

Here, a major factor in Villanueva's trial was credibility; jurors had to decide whether to believe S.M. or Villanueva. In that regard, the physical evidence of bruises and scratches on S.M. would appear to corroborate her story. However, defense counsel was able to elicit testimony from Dr. McCoy indicating that S.M. could have scratched herself. KBI testing of the vaginal swabs taken during the rape examination of S.M. was negative for semen and seminal fluid.

Despite stating that she was unable to make a diagnosis, Paynter testified that "classic characteristics of a victim of a rape" were

documented in S.M.'s records. The trial court erroneously allowed Paynter, unqualified to diagnose or to testify as an expert witness on rape trauma syndrome, to state to the jury that S.M.'s behavior was consistent with that of rape trauma victims. Her testimony undoubtedly bolstered S.M.'s credibility to the detriment of Villanueva.

The evidence against Villanueva, although strong enough to convince many of his guilt, cannot be characterized as "overwhelming." We find that the trial court's admission of Paynter's testimony had a higher likelihood of changing the results of the trial than "little, if any." We reverse and remand this matter for a new trial.

For his second assertion of error, Villanueva maintains that the prosecutor's inflammatory comments during closing argument denied him a fair trial.

" 'The analysis of the effect of a prosecutor's allegedly improper remarks is a two-step process. First the appellate court determines whether the remarks were outside of the considerable latitude the prosecutor is allowed in discussing the evidence. This analysis commences with the holding that "[i]n criminal trials, the prosecution is given wide latitude in language and in manner of presentation of closing argument as long as it is consistent with the evidence adduced." *State v. Duke*, 256 Kan. 703, Syl. ¶ 5, 887 P.2d 110 (1994).'

"Second, '[e]ach case must be scrutinized on its particular facts to determine whether a trial error is harmless error or prejudicial error when viewed in the light of the trial record as a whole, not whether each isolated incident viewed by itself constitutes reversible error.' [Citation omitted.]. . . .

". . . Specifically, '[i]n deciding the question of whether prosecutorial misconduct requires reversal, an appellate court determines whether there was little or no likelihood the error changed the result of the trial.' " *State v. Lumley*, 266 Kan. 939, 959, 976 P.2d 486 (1999).

" ' " 'When determining whether prosecutorial misconduct was prejudicial, factors that should be considered include: (1) Is the misconduct so gross and flagrant as to deny the accused a fair trial? (2) Do the remarks show ill will on the prosecutor's part? (3) Is the evidence against the defendant of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors? [Citations omitted.]' " ' " *Leitner*, 272 Kan. at 421 (quoting *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461[1997]).

At trial, during closing rebuttal, the prosecutor discussed S.M.'s inability to testify about the details of the rape, ascribing it to the trauma of the event. Then the prosecutor stated: "The funny thing

is that's not the—that's not the only rape that took place in this case. The second rape . . . took place when she had to come in here and had her character attacked and her memory attacked." Defense counsel immediately objected, stating: "[T]his is improper. She's a witness." The trial judge responded by telling the prosecutor, "I think we need to leave that area."

The record reveals that the jurors were instructed: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded."

In its brief, the State acknowledged "that the prosecutor used a poor choice of words" to frame "S.M's testimony in light of the vigorous cross-examination" conducted by counsel for Villanueva. The State advised in its brief that the comments "were intended to bolster the credibility of S.M. by pointing out her calm under pressure . . . . [and] were not intended to disparage [defense counsel] nor [Villanueva]." The State appears to have conceded that the remarks were outside of the considerable latitude the prosecutor is allowed in closing argument.

After its review of the trial record and jury instructions, the Court of Appeals concluded that the remarks did not show ill will, would have little weight with jurors, and did not deny Villanueva a fair trial. 29 Kan. App. 2d at 1063-64. On review, Villanueva challenges the Court of Appeals' determination that the prosecutor's comments were not so prejudicial as to deny him a fair trial.

Looking at the three factors relevant to this determination, we must first decide if the prosecutor's misconduct was so gross and flagrant as to deny the accused a fair trial. In *State v. Lewis*, 238 Kan. 94, 98, 708 P.2d 196 (1985), this court compared this to asking whether "the objectionable statements [were] likely to affect the jurors to the defendant's prejudice."

Villanueva contends that the prosecutor's comments "tipped the scale in favor of S.M." by creating sympathy for the victim. The Court of Appeals found that "the prosecutor's remarks were not only intemperate but an explicit appeal to the prejudices of jurors." 29 Kan. App. 2d at 1063.

In addition, Villanueva asserts that the comments improperly denigrated defense counsel. The Court of Appeals found that at the hearing on the motion for a new trial, defense counsel had indicated that he did not believe the prosecutor made the comments with any intent to disparage counsel. 29 Kan. App. 2d at 1063. On review, Villanueva takes the position that the Court of Appeals mischaracterized defense counsel's statements. Villanueva instead asserts that defense counsel told the trial court that although he did not believe the State made these comments on purpose, they were clearly outside the scope of proper argument.

We agree that prosecutor's comments concerning the second rape of S.M. during trial were outside the scope of proper argument.

The second factor for our determination is whether the remarks show ill will on the part of the prosecutor. Villanueva asserts that the remarks evidence ill will because they were clearly made in an effort to obtain a conviction without regard for the propriety of the comments. Villanueva again highlights the words of the prosecutor as an attack on defense counsel and a plea for sympathy for the victim.

This court must look at each case viewed in the light of the trial record as a whole and not merely determine whether an isolated incident by itself constitutes reversible error. *Lumley*, 266 Kan. at 959. We find that in light of the trial record as a whole, the prosecutor's improper comment by itself fails to demonstrate ill will.

The third factor for our determination is whether the evidence against Villanueva is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. The Court of Appeals found the "evidence of Villanueva's guilt is strong and persuasive." 29 Kan. App. 2d at 1065. Villanueva urges us to focus on "whether the error contributed to the guilty verdict rendered against the defendant," and not on whether the evidence was "strong and persuasive."

Our test is whether the prosecutor's improper comments would have little weight in the minds of the jurors in light of the evidence against Villanueva. Villanueva urges this court to believe that because his first trial ended in a mistrial, the comments of the pros-

ecutor that the victim was raped a second time at trial played a key role in securing his conviction at the second trial. We find that this isolated comment by the prosecutor would have little bearing in the minds of the jurors because of substantial, although not over-whelming, evidence against Villanueva.

" 'Not every trial error or infirmity which might call for application of an appellate court's supervisory powers correspondingly constitutes a failure to observe the fundamental fairness that is essential to the very concept of justice.' *State v. Ruff*, 252 Kan. 625, 631, 847 P.2d 1258 (1993). 'Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial.' [Citations omitted]" *Leitner*, 272 Kan. at 421.

In conclusion, we find that although the prosecutor's remarks improperly appealed to the sympathies of the jury, in light of the trial record as a whole they did not rise to the level of denying Villanueva's right to a fair trial.

Reversed and remanded for a new trial.