No. 98,822

STATE OF KANSAS, *Appellee*, v. RODOLFO GAONA, *Appellant*.

(270 P.3d 1165)

Opinion filed March 2, 2012.

*Matthew J. Edge,* of Kansas Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Tamara S. Hicks,* assistant county attorney, argued the cause, and *John P. Wheeler,* county attorney, and *Steve Six,* attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Rodolfo M. Gaona appeals his conviction and sentence in this rape and aggravated sodomy case involving his stepdaughter, M.L.

Gaona was charged with the following crimes: Count One—rape, on or about December 20, 2005, in violation of K.S.A. 21-3502(a)(2); Count Two—aggravated criminal sodomy, on or about December 20, 2005, in violation of K.S.A. 21-3506(a)(1); Count Three—rape, on or about December 19, 2005, in violation of K.S.A. 21-3502(a)(2); Count Four—aggravated criminal sodomy, on or about December 19, 2005, in violation of K.S.A. 21-3506(a)(1); Count Five—rape, on or about September 1, 2005, through September 30, 2005, in violation of K.S.A. 21-3502(a)(2);

Count Six—aggravated criminal sodomy, on or about September 1, 2005, through September 30, 2005, in violation of K.S.A. 21-3506(a)(1); Count Seven—aggravated criminal sodomy, on or about March 23, 2005, through December 19, 2005, in violation of K.S.A. 21-2506(a)(1).

The jury convicted Gaona of the rapes charged in Counts One and Three and of the aggravated criminal sodomies charged in Counts Two and Seven. The Court of Appeals reversed Gaona's conviction on Count Three. *State v. Gaona*, 41 Kan. App. 2d 1064, 1071, 208 P.3d 308 (2009). Gaona then petitioned for this court's review of his three remaining convictions and his sentence. The State did not cross-petition on Count Three, for which the Court of Appeals had ordered a remand.

## ISSUES

Because the Court of Appeals granted Gaona relief on the issue of whether an attempted rape instruction should have been given for Count Three, we have seven issues left for our examination:

1. Was it error to allow the Executive Director of Finding Words of Kansas to testify as an expert about the behavior of child victims of sexual abuse?
2. Did the district judge err by failing to give a lesser included instruction on attempted aggravated criminal sodomy for Counts Two and Seven?
3. Was it error to exclude Gaona's medical records?
4. Was it error to admit evidence that Gaona showed M.L. pornographic movies without an analysis of the evidence under K.S.A. 60-455?
5. Was it error to admit evidence of M.L.'s prior consistent statements before her own live testimony was given at trial?
6. Does cumulative error require reversal of Gaona's convictions?
7. Is Gaona entitled to vacation of his remaining sentence and remand for resentencing because he was given the highest term in the applicable Kansas Sentencing Guidelines Act grid box for Counts One, Two, and Seven, without proof of any aggravating factor to a jury beyond a reasonable doubt?

We hold that no error requires reversal of Gaona's three remaining convictions or his sentence for them.

## FACTUAL AND PROCEDURAL BACKGROUND

In Gaona's trial, the State called M.L.'s mother, R.G., as its first witness. R.G. testified that she was married to Gaona and that she, Gaona, M.L., and her son lived together. R.G. further testified that M.L. was 11 years old and that she had been diagnosed with Attention Deficit Hyperactivity Disorder. R.G. worked second shift, and Gaona would watch the children while she was at work. M.L. typically arrived home from school before her brother, and Gaona arrived home from work between 5:30 p.m. and 6:30 p.m.

R.G. testified that the morning of December 21, 2005, she, her son, and M.L. went shopping after she and Gaona had had an argument. During the outing, her son told his mother that Gaona and M.L. had a "sick game." When R.G. asked M.L. what he was talking about, M.L. started crying and "told me that she couldn't tell me because something bad would happen to me." After M.L. calmed down, R.G. asked M.L. questions in order "to be sure that there was actually a crime before I did anything about it," including asking whether Gaona put his penis in M.L.'s vagina. Later, once R.G. had taken M.L. to the police station, M.L. talked to Detective Jeff Steele and investigator Nikki Wiecken. M.L. then was taken to the hospital for a sexual abuse evaluation by a Sexual Assault Nurse Examiner (SANE). After the SANE evaluation, M.L. was interviewed by Wiecken with a social worker present.

R.G. also testified that M.L. told her that the encounters with Gaona caused M.L. to bleed, but R.G. never found blood on M.L.'s clothes, bedding, or the toilet. R.G. testified that M.L. had mentioned having pain while going to the bathroom but was never seen by a doctor for this complaint. R.G. also testified that M.L. told her she had seen a pornographic movie with Gaona and that Gaona had threatened her.

R.G. was questioned about other adult males with whom M.L. had been in contact and said that the only other such males were friends and neighbors. R.G. was also questioned about her relationship with Gaona. She testified that she and Gaona had disa-

greements, a few of which were loud and some of which occurred in front of the children. R.G. did not recall ever asking Gaona for a divorce, but Gaona had told her several times that she could leave him. Although R.G. remained married to Gaona at the time of his trial, she testified that she could not afford to get a divorce and that she and the children had had no contact with him since M.L.'s allegations came to light. R.G. also testified that Gaona had told her about having a prostate problem.

M.L.'s brother, age 9, testified at trial that he could not remember what M.L. told their mom while shopping. He said that he had seen Gaona and M.L. in Gaona's bedroom, with M.L. lying on the bed and Gaona standing in front of the bed. M.L.'s brother said that Gaona was doing "[s]omething to my sister," which he called "[p]laying a nasty game with her." At trial, M.L.'s brother said that he saw the "nasty game" more than once, but he could not remember how many times; before trial, he had told a police officer that he saw it one time, but he had told his mother that he saw it more than once.

M.L.'s brother further testified that "my sister didn't seem that she liked" the "nasty game." But he also said that he did not see Gaona touch M.L. and that both Gaona and M.L. had their clothes on each time he saw them. He said he never talked to M.L. about what he had seen, and Gaona had told him not to tell his mother. He did not tell his mother until the shopping excursion because he was afraid Gaona would hurt his mother.

M.L.'s brother also testified that he sometimes heard his mother and Gaona arguing but "not very much" and that it bothered him "a little bit." He said that he only "kind of" liked Gaona as a step-father and wanted to get rid of him "[a] little bit."

M.L. testified at trial that she talked to her mother after her brother told her mom "what [Gaona] did." She described going to the police station, telling a police officer what happened, and then seeing a nurse for an examination and telling the nurse what happened. M.L. said that she had to go to the nurse because Gaona "was doing something real bad." When asked what that meant, M.L. first said "I don't want to say it," but then explained that it meant Gaona "was making me have sex with him."

M.L. testified that she referred to her private parts as her "yaya" and to a boy's private parts as a "doinkey." She stated that Gaona had touched her yaya. She said she "forgot" whether Gaona's doinkey touched her yaya, but she testified that his doinkey touched her "butt." M.L. told the nurse that her yaya got sore and explained that it was caused by "[t]he doinkey." She further testified that Gaona put his doinkey in her mouth, and she told him to quit. She also testified Gaona touched her butt with his finger, but she "forgot" if it went inside. M.L. first answered "[n]o, no," when asked if Gaona put his finger in her yaya, but then said that he did. She stated that she did not know how many times Gaona had touched her, but that it was more than once. M.L. had previously testified that the last time Gaona touched her she had her eyes closed and did not see which part of his body touched her.

M.L. also testified that she and Gaona had watched a movie with naked people in it one time. The touching that she said Gaona did to her was also what had happened in the movie. M.L. testified that she did not know what dates the touching occurred, but they happened when her brother was asleep or at a friend's house and her mom was at work. M.L. initially stated that the time her brother saw her and Gaona when she was on the bed, she and Gaona both had their clothes on and were not touching. She later testified, however, that her brother saw them more than once; and she did not know if they were clothed each time. M.L. said that Gaona had told her not to reveal what happened and said he would shoot her family if she did.

M.L. also testified that she did not like Gaona as a stepfather and that she wanted to get rid of him. She thought he was unfair when he punished her, and she did not like it when he argued with her mother, which happened often.

Wiecken, the investigator who interviewed M.L. on the day the crimes were reported and again the day after, testified that she had special training to interview children but did not have a college degree. Wiecken completed a "Finding Words" program covering a particular interview protocol to be used when there were allegations of child sexual abuse. By the time of Gaona's trial, Wiecken had completed approximately 30 forensic interviews of children,

20 before her interview of M.L. About half a dozen of the children were around M.L.'s age.

Wiecken testified that she attempted to get "sensory type details" from the children she interviewed, because "these aren't things that a child can really be coached on." Part of the Finding Words protocol calls for "exploring the alternative hypothesis," and Wiecken said that she and M.L. discussed other people in the home. M.L. denied that anyone else had touched her in the way Gaona had. Wiecken did not ask M.L. specifically if she had been around other adults on December 19 and December 20, 2005. Wiecken testified that she used dolls and anatomical drawings during her interviews with M.L., who "was having a hard time talking about what happened to her." M.L. did talk about "sex movies" and disclosed the date of her last contact with Gaona. She also told Wiecken that someone named Luis had told her mother to leave Gaona. R.G. told Wiecken that Luis was a coworker in whom she had confided.

Wiecken's interviews of M.L. were videorecorded and the recordings admitted into evidence and played to Gaona's jury at trial.

Wiecken also interviewed M.L.'s brother twice, but only the second interview was recorded. Using dolls, he told Wiecken that he had seen M.L. on the bed and Gaona standing by the bed and demonstrated with the doll a motion "described as a humping or [what] one might see in sexual acts." M.L.'s brother told Wiecken this incident occurred before Halloween and said he witnessed it when he got off the bus from school and came inside the house. Wiecken did not ask him why he had not told his mother what he saw, but he told her "he was scared that something bad was going to happen." He told her he saw this happen only once, but R.G. called later in the day of her son's interview and said that he told her he had seen it more than once.

Pam Washburn, a Sexual Assault Nurse Examiner (SANE), testified about her examination of M.L., including M.L.'s description of what had occurred. M.L. told Washburn that her stepfather was having sex with her and showing her sex movies. She said, "He put his thing up my butt and, um, he tried to have sex with me"; "[t]hat's what he always does"; and "[t]hat's what he always does,

puts his doinkey in my yaya." M.L. also reported that she sometimes bled when she went to the bathroom. Washburn further testified that M.L. told her she and Gaona watched a sex movie on December 20, 2005, and that, on December 19, 2005, Gaona "tried to have sex with [her]."

Washburn testified that she had found an "irregular margin" on M.L.'s hymen, an "abnormal finding" for a pediatric patient and one consistent with sexual abuse. She observed no abnormal findings in M.L.'s anal area, but she testified that "injury to the anal area is extremely rare." Washburn saw no physical evidence of acute trauma during her exam of M.L.

An evidence technician and two investigators, all with the Finney County Sheriff's Office, testified that pornographic movies were among the evidence collected from Gaona's home.

The State called Kelly Robbins, who is the Executive Director and co-founder of the Western Kansas Child Advocacy Center and the Executive Director of Finding Words of Kansas, to testify as an expert witness. Robbins is not a licensed mental health professional. She holds a bachelor's degree in Administration of Justice in Investigation with a minor in Chemistry and holds an associate's degree qualifying her as a medical laboratory technician. She previously worked for the Kansas Bureau of Investigation as a forensic scientist and as a Special Agent conducting criminal investigations, including investigations of child sex abuse cases in which she interviewed child victims; but she has no formal training in psychology, psychiatry, social work, or child development. She does not have any published articles.

Robbins testified that forensic interviews of children who allege sexual abuse follow "a semi-structured protocol that allows for the child to tell in their own words what happened." Robbins received training in the Finding Words protocol and was certified to conduct forensic interviews using the protocol by the American Prosecutors Research Institute. She testified that the protocol is supported by more than 150 "research articles." Robbins also said that she had taught parts of the Finding Words course, focusing on interviewing techniques. As of the time of Gaona's trial, Robbins had personally interviewed more than 150 children.

Robbins gave no testimony specific to M.L.'s interviews or allegations.

After Robbins discussed her background and qualifications, the State asked her: "Through your training and experience . . . are there any specific patterns or dynamics that you see in children of sexual abuse?" Gaona's counsel objected on the grounds of "lack of foundation, improper lay opinion, lack of personal knowledge, [and] not qualified as an expert." The district court judge noted and overruled the objection. Gaona's counsel again objected during Robbins' later testimony when the State asked about patterns regarding sexual abuse "borne out in the research [Robbins] read." Gaona's counsel argued that Robbins was "not qualified to give an opinion or to answer questions of that nature without specialized knowledge that she does not have." The district judge again noted and overruled the objection. Gaona's counsel then requested and was granted a continuing objection to all of Robbins' "testimony on this basis."

In response to the State's question regarding patterns and dynamics present in children of sexual abuse, Robbins stated that "one of the main things is that there's secrecy around child abuse . . . especially child sexual abuse." According to Robbins, secrecy and fear often lead children not to disclose such abuse the first time it occurs. This phenomenon of "delayed disclosure" can extend "anywhere from weeks, it could be years, it may be that they never tell." Robbins further testified that children display "a variety of reactions of what they do to survive this abuse." When a child does first disclose abuse, the disclosure is often a "tentative disclosure" in which the child will "only feel comfortable about giving some of the information," adding more information later. Robbins further testified that "the majority of the children . . . care for their abusers" and that it is harder for a child to report abuse if it occurs in the child's home or is perpetrated by a family member.

Robbins opined that it was difficult to coach a child into alleging nonexistent sexual abuse, stating that such a practice was "probably rare" and would "take[] a lot of effort and time." Like Wiecken, Robbins stressed the importance of trying to get children to share "sensory details" of their experiences. She also said that, as an in-

terviewer, one should guard against confirmatory bias by "being objective" and "not having your mind made up." She testified that it was "very important that we do our investigation properly so that we don't have injustice." Yet she described herself as a "fact-finder" rather than a mental health professional.

The defense presented three witnesses at trial.

Clinical psychologist Robert Barnett testified as an expert on flaws in the Finding Words interview protocol and Wiecken's interviews of M.L. and her brother in particular. Barnett, who said he had conducted 100 to 200 sexual abuse interviews of children, also criticized what he saw as Washburn's confirmatory bias in the medical history she took from M.L. at the time of the sexual abuse physical exam.

A manager at Gaona's place of employment testified that Gaona did not work on December 1, 9, 10, 11, 19, or 27, 2005, and normally worked from 6 a.m. to 5 p.m.

For himself, Gaona testified that he had problems with his prostate, which meant he had difficulty achieving an erection "most of the time," starting 5 months before his arrest on December 21, 2005. Gaona said he had begun seeing a doctor for these problems 3 months before his arrest. Gaona further testified that his wife, R.G., was aware of his problem because "sometimes" he could not have sex with her. Gaona also testified that he and his wife discussed divorce the day before his arrest, and he denied M.L.'s sexual abuse allegations.

## DISCUSSION

*Expert Testimony by the Executive Director of Finding Words of Kansas*

" 'Generally, the admission of expert testimony lies within the sound discretion of the trial court, and its decision will not be overturned absent an abuse of such discretion.' " *State v. Reyna*, 290 Kan. 666, 682, 234 P.3d 761 (2010) (quoting *State v. Johnson*, 286 Kan. 824, 831, 190 P.3d 207 [2008]). The party alleging the abuse of discretion bears the burden of proof. *Irvin v. Smith*, 272 Kan. 112, 125, 31 P.3d 934 (2001) (citing *State v. Mullins*, 267 Kan. 84, 93, 977 P.2d 931 [1999]).

Further, if a district court abuses its discretion in admitting expert testimony, the error is subject to harmlessness analysis. *State v. Carapezza*, 286 Kan. 992, 1005, 191 P.3d 256 (2008). K.S.A. 60-261 requires the court to find an erroneous admission of evidence to be harmless unless it "affects the defendant's substantial rights." *Carapezza*, 286 Kan. at 1005. In our recent *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), we confirmed that the standard for harmlessness of nonconstitutional error is whether the court is persuaded that there is no reasonable probability that the error affected the outcome of the trial. *Ward*, 292 Kan. at 565-66. The burden of demonstrating harmlessness of a nonconstitutional error is on the party benefiting from the error. See *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

On appeal to the Court of Appeals and again before this court on petition for review, Gaona has challenged Robbins' qualifications to opine on the characteristics of children who have been subjected to sexual abuse. Citing this court's decisions in *State v. Villanueva*, 274 Kan. 20, 31, 49 P.3d 481 (2002), and *State v. McIntosh*, 274 Kan. 939, 959-60, 58 P.3d 716 (2002), Gaona argues that "[e]xpert testimony as to the behaviors of sexual assault victims should be given by an expert qualified to diagnose and treat mental disorders, such as a psychiatrist or a licensed clinical social worker with a master's degree in social work." In Gaona's view, Robbins testimony unfairly gave the State "corroborating" evidence of M.L.'s abuse and could not be deemed harmless.

The State responds that our *McIntosh* decision contemplated admission of exactly the type of testimony given by Robbins in this case, which met the requirements of K.S.A. 60-456(b) and did not improperly "render an opinion on the victim's credibility," but explained the phenomenon of delayed disclosure to the jury. The State stresses that Robbins did not present any diagnosis of M.L., speaking only about common traits for child sexual abuse victims and not her specific traits.

Our Court of Appeals essentially accepted the State's argument, holding that nothing in *McIntosh* and *Villanueva* prohibited "qualified expert witness testimony on the common patterns of behavior of a sexually abused child . . . to corroborate the complaining wit-

ness' allegations," and that our previous cases did not limit those giving such testimony to certain types of professionals. *Gaona*, 41 Kan. App. 2d at 1068 (quoting *McIntosh*, 274 Kan. at 957). In the view of the panel, based on the criteria provided in K.S.A. 60-456(b), Robbins was qualified to testify on the behavioral traits of sexually abused children because that subject was "within the scope of the special knowledge, skill, experience or training" she possessed, and she appropriately

"confined her testimony to the common behavioral traits without relating them to the specific victim, . . . did not provide diagnostic testimony beyond her credentials, . . . did not state or imply that M.L. had been sexually abused, . . . did not opine on whether the victim was truthful or credible, . . . [and] did not suggest in any manner that Gaona had any involvement." *Gaona*, 41 Kan. App. 2d at 1069.

Both the Court of Appeals panel and the parties have recognized the controlling force of K.S.A. 60-456(b), which limits the admission of expert opinions to those that are "based on facts or data perceived by or personally known or made known to the witness at the hearing" and "within the scope of the special knowledge, skill, experience or training possessed by the witness." The parties have not made an issue of the first requirement; their dispute centers only on whether Robbins was qualified, *i.e.*, whether her testimony was sufficiently informed by her "special knowledge, skill, experience or training" beyond that of an ordinary juror.

Our decisions in appeals of sex crime convictions have long wrestled with the proper scope of testimony about the psychological trauma such crimes inflict on victims; about victims' behavior or lack of behavior symptomatic of such trauma, including whether a particular psychiatric diagnosis has been made; and about the qualifications that must be possessed by any expert witness on such matters. See *McIntosh*, 274 Kan. at 955-59 (licensed clinical social worker permitted to testify victim "exhibited behavioral patterns consistent with a child who had been sexually abused," testimony circumstantially supported victim's credibility); *Villanueva*, 274 Kan. at 24-28, 33 (supervisor at Metropolitan Organization to Counsel Sexual Assault unqualified to diagnose rape trauma syndrome, to compare victim's behavior to that of other rape victims; court observes testimony "undoubtedly bolstered" victim's credi-

bility); *State v. Plaskett,* 271 Kan. 995, 1014-15, 27 P.3d 890 (2001) (social workers permitted to testify about victim fitting profile of sexually abused child; court declines to overrule earlier decision allowing such testimony from social workers); *Welch v. State,* 270 Kan. 229, 233-36, 13 P.3d 882 (2000) (challenge to qualifications of social worker to testify on post-traumatic stress disorder diagnosis of child victim unpreserved for review; court nevertheless notes recent statutory changes permitting social workers to diagnose, treat psychiatric conditions; court acknowledges legislation affects earlier holdings limiting testimony of social workers, as opposed to psychiatrists, psychologists); *State v. Willis,* 256 Kan. 837, 846, 888 P.2d 839 (1995) (social worker not qualified to make psychiatric diagnosis of post-traumatic stress disorder, rape trauma syndrome; social worker thus not qualified to testify about diagnosis in rape case involving consent defense; testimony distinct from evidence permitted from social worker about child victim's behavior consistent with other victims' behavior, including common delayed disclosure of abuse); *State v. Reser,* 244 Kan. 306, 309-15, 767 P.2d 1277 (1989) (social worker with master's degree, recognized expertise on child sexual abuse, qualified to testify about symptoms, common patterns of behavior resulting from trauma, including delayed reporting of abuse; social worker did not discuss diagnosis of victim, only characteristics shared with other victims; evidence relevant to corroboration of occurrence); *State v. Clements,* 241 Kan. 77, 78-80, 734 P.2d 1096 (1987) (psychologist permitted to testify about child victim's initial condition, progress in therapy consistent with that of child who had been sodomized under circumstances alleged by State; testimony distinct from cases in which expert permitted to vouch for credibility of victim); *State v. McQuillen,* 239 Kan. 590, 590-93, 721 P.2d 740 (1986) (psychiatrist permitted to testify about symptoms common in sufferers of rape trauma syndrome, observation of symptoms in victim; psychiatrist stopped short of testifying victim truthful, had been raped, assailant defendant); *State v. Jackson,* 239 Kan. 463, 470, 721 P.2d 232 (1986) (social workers went too far in testifying that child victim telling truth about sexual abuse by defendant, despite sufficient qualifications in form of extensive training, experience in child

abuse treatment); *State v. Lash*, 237 Kan. 384, 385-86, 699 P.2d 49 (1985) (error to admit psychologist's testimony that victim had been molested by defendant, victim's father; testimony that victim exhibited characteristics consistent with history of sexual abuse distinguished); *State v. Bressman*, 236 Kan. 296, 301-04, 689 P.2d 901 (1984) (error to admit testimony of emergency room physician that victim had been raped, shared common characteristics of patients who reported they had been raped; physician not trained in psychiatry not qualified as expert); *State v. McQuillen*, 236 Kan. 161, 689 P.2d 822 (1984) (psychiatrist's testimony that victim afflicted with emotional, psychological effects consistent with rape trauma syndrome should have been admitted in rape prosecution in which consent defense presented); *State v. Marks*, 231 Kan. 645, 654, 647 P.2d 1292 (1982) (testimony of psychiatrist that victim suffered from rape trauma syndrome permitted over argument that it invades province of jury; relevant to combat defendant's allegation that victim consented to sexual intercourse; qualifications of psychiatrist not in issue); see also *McQuillen*, 236 Kan. at 174 (Herd, J., concurring) (pointing out that Kansas law does not permit such testimony from "[mere] . . . rape counselor"); compare *McQuillen*, 236 Kan. at 178 (Schroeder, C.J., dissenting) (diagnosis of rape trauma syndrome therapeutic tool, not factfinding one; "evidence of reactions of other people to stressful situations, or evidence that the prosecutrix may have experienced some stressful sexual experience which may or may not have involved the defendant or the particular incident in question, does not assist the jury in its factfinding function and serves only to bolster the credibility of the prosecutrix's testimony by unrelated 'scientific' evidence").

Our cases reflect refinement of certain principles over time. Initially we set limits on the subject of an expert's testimony, forbidding invasion of the jury's province and its responsibility to judge credibility. Even a psychiatrist or psychologist could not testify that a particular alleged victim had been subjected to rape or abuse by a particular defendant or in a particular manner consistent with the State's version of events. See *Lash*, 237 Kan. 384. But the rules relaxed somewhat as the testimony became more general. A victim's diagnosis with post-traumatic stress disorder or rape trauma

syndrome could be made and described for the jury by those with appropriate professional qualifications—initially, only a psychiatrist or psychologist, and then, after statutory changes, certain social workers. See *Welch*, 270 Kan. at 233-36; *Clements*, 241 Kan. at 78-80; *McQuillen*, 239 Kan. at 590-93; *Marks*, 231 Kan. at 654. The same group of professionals—psychiatrists, psychologists, certain social workers—could take the next, more general step as well. They could testify to common characteristics of victims of sexual trauma and identify the alleged victim's characteristics as consistent. See *McIntosh*, 274 Kan. at 955-59; *Plaskett*, 271 Kan. at 1014-15; *Reser*, 244 Kan. at 309-15; *McQuillen*, 239 Kan. at 590-93. Those with lesser credentials were unwelcome. A rape crisis counselor with a sexual assault crisis center could neither diagnose from the witness stand nor compare the alleged victim in a particular case with known victims. See *Villanueva*, 274 Kan. at 24-28.

Our most recent decision in *Reyna* is consistent with the pattern set by earlier cases. We held there was no abuse of discretion when the trial judge allowed a licensed family therapist who was authorized to diagnose and treat mental disorders, see K.S.A. 65-6404(b)(2)(C)(3), and who specialized in treating victims of child sexual abuse to make "general statements concerning the behavior of child sexual abuse victims." *Reyna*, 290 Kan. at 670-71. The therapist had testified that "a large percentage of children who have been sexually abused do not report that fact immediately and that when they do report they are not always focused on the same details that would be important to an adult investigating the abuse." *Reyna*, 290 Kan. at 682-83. The testifying expert's qualifications were not directly in dispute. See *Reyna*, 290 Kan. at 685-86. Rather, the defendant in *Reyna* argued about the subject of the testimony. *Reyna*, 290 Kan. at 683. We rejected this argument without focusing on the qualifications of the witness. Indeed, we cited the Court of Appeals panel's decision in this case as one in which testimony on the same subject matter had been approved. See *Gaona*, 41 Kan. App. 2d at 1068-69.

It is interesting to note that Kansas courts have been inhospitable to similar expert testimony about defendants' psychological profiles in sex crime cases. For example, we did not allow a prosecutor to

capitalize upon a State psychologist's testimony about the characteristics of pedophiles by arguing in closing that the defendant possessed those characteristics. See *State v. Clements*, 244 Kan. 411, 415-20, 770 P.2d 447 (1989). Our Court of Appeals rejected a defendant's attempt to introduce expert testimony that the defendant did not possess the characteristics of a pedophile. See *State v. Price*, 30 Kan. App. 2d 569, 576-81, 43 P.3d 870 (2002).

A separate line of cases from our Court of Appeals having to do with admissibility and advisability of expert testimony on child interviewing techniques in sexual abuse prosecutions, although not cited by either party, also provides helpful context for our decision here.

In *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222 (2002), a Court of Appeals panel granted a K.S.A. 60-1507 movant a new trial because his counsel failed to procure an expert on the subject of interviewing techniques and the suggestibility of child subjects. The panel stressed that there was no physical evidence of the victim's sexual abuse and thus the defendant was convicted primarily on the testimony of the victim, reinforced by several pretrial interviews in which the victim's story was repeated, and the examining nurse's improper testimony that the victim had not been coached. Without an effort to procure an interview techniques expert to testify at trial, counsel's performance could not be characterized as strategic and constitutionally sound. Furthermore, "[t]rial counsel's failure to challenge the reliability of the victim's prior disclosures . . . severely hampered the ability to challenge the victim's testimony at trial." *Mullins*, 30 Kan. App. 2d at 717.

In *State v. Lewis*, 33 Kan. App. 2d 634, 111 P.3d 636 (2003), another Court of Appeals panel again examined a K.S.A. 60-1507's movant's allegation that his lawyer provided ineffective assistance of counsel by failing to call an expert to challenge the child interview method used in the State's investigation, but the panel reached a different result. It concluded that the law on whether such testimony would be admissible was unsettled at the time of the movant's trial, and thus his counsel's failure to call such a witness was not objectively unreasonable. It distinguished *Mullins* in part because the evidence presented in the K.S.A. 60-1507 hearing

in *Mullins* had gone virtually unchallenged by the State. *Lewis*, 33 Kan. App. 2d at 644-48.

In *State v. Criqui*, No. 88,388, unpublished opinion filed September 12, 2003, *rev. denied* 277 Kan. 925 (2003), a Court of Appeals panel examined the defendant's claim in an aggravated criminal sodomy and aggravated indecent liberties prosecution that the district court committed reversible error in denying the defendant's "request to introduce expert testimony [of a licensed psychologist] concerning the reliability of children's testimony based upon proper and improper interview techniques." Slip op. at 1. The Court of Appeals noted that such an expert could not opine on witness credibility, but that the district court erred in excluding the expert's "testimony as to: (1) the proper and improper interviewing procedures and techniques to be used in child sexual abuse cases; (2) how certain procedures and techniques could adversely affect the reliability and accuracy of a child's statements; and (3) the problems that [the expert] perceived with the interviewing techniques used in [defendant's] case." *Criqui*, slip op. at 5. The Court of Appeals, however, held the error harmless. *Criqui*, slip op. at 5.

In *State v. Olga*, No. 93,464, unpublished opinion filed July 21, 2006, a Court of Appeals panel examined the district court's limitation on the testimony of a psychologist specializing in issues surrounding child abuse in the defendant's prosecution for rape against his minor daughter and aggravated criminal sodomy against his minor son. Slip op. at 1. The district court allowed the expert to "testify concerning generally acceptable techniques that should be used in interviewing children where abuse is suspected" and "to compare the techniques that [the expert] said should be used to those that were actually used in interviewing the children." *Olga*, slip op. at 6. The expert was prohibited from testifying "that she believed the children had been led to make these accusations and, therefore, the abuse did not happen." *Olga*, slip op. at 6. The panel concluded that the district court correctly limited the expert's testimony to "information that would be helpful to the jury and would not pass on the credibility of other witnesses." *Olga*, slip op. at 7.

Finally, in *State v. Huntley*, 39 Kan. App. 2d 180, 177 P.3d 1001 (2008), a Court of Appeals panel was compelled to reverse the defendant's convictions for rape and aggravated sodomy of his own young children because of the trial judge's refusal to grant a continuance to retain an expert on the forensic interviews conducted with the victims. Observing that the defense was "heavily dependent on casting doubt on the reliability of [the] child witnesses," the panel recognized that such an expert could be "of utmost importance" and thus the denial of the continuance prejudicial. Because the trial judge denied the continuance based on an erroneous legal conclusion about the admissibility of such expert evidence, a conclusion belied by *Mullins*, the judge's decision qualified as an abuse of discretion. *Huntley*, 39 Kan. App. 2d at 189.

Here, the defense sponsored testimony like that discussed in this uncited line of Court of Appeals cases. Barnett, a psychologist who had conducted 100 to 200 interviews of children, criticized the Finding Words protocol generally and Wiecken's interviews of M.L. and her brother specifically. Robbins' testimony was actually a hybrid—on the one hand, an endorsement of the Finding Words protocol designed to back up Wiecken and undercut Barnett, and, on the other hand, an explanation of the common characteristics of child abuse victims that then could be argued were consistent with the characteristics of M.L. She described herself as a "factfinder" and testified about the "Finding Words" method for forensic interviews of children who have alleged sexual abuse. This was the method employed by Wiecken, who interviewed M.L. and her brother, and who also testified about Finding Words. Robbins went further than Wiecken, however, testifying over defense objections, that children who are victims of sexual abuse often do not disclose the abuse immediately and, when they do disclose, may do so piecemeal over time. Robbins also opined that coaching of children to make false allegations of sexual abuse would be difficult and was "probably rare."

The problem is that Robbins was qualified under K.S.A. 60-456 to give the first type of expert testimony but not the second.

Robbins is not a psychiatrist or a psychologist or a social worker authorized by K.S.A. 65-6319 or a family therapist authorized by

K.S.A. 65-6404(b)(2)(C)(3) to diagnose and treat mental disorders. She is an investigator. To the extent her expert testimony remained focused on the Finding Words protocol and its reliability, she was clearly qualified. K.S.A. 60-456 does not impose education or licensure requirements; the statute emphasizes "the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456(b). And we have emphasized skill and experience in prior decisions:

"We have found that to be competent as an expert, a witness must be skilled or experienced in the profession to which the subject relates. *State v. Willis*, 256 Kan. 837, 839, 888 P.2d 839 (1995). An expert witness 'must be qualified to impart to the jury knowledge within the scope of his special skill and experience that is otherwise unavailable to the jury from other sources.' 256 Kan. at 839." *Diggs*, 272 Kan. 349, 365, 34 P.3d 63 (2001).

Robbins has experience and training with Finding Words and, more generally, with forensic interviews of children who have alleged sexual abuse. Jurors do not possess this information, and Robbins' testimony was helpful to their understanding of the case. It was not an abuse of the trial judge's discretion to permit her, like defendant's expert Barnett, to testify as an expert under K.S.A. 60-456(b) on the procedures followed and the pitfalls to be avoided in such interviews. We also note that Robbins' testimony on Finding Words was largely cumulative of Wiecken's.

In contrast, Robbins was not qualified to testify as an expert on the characteristics of victims of child sexual abuse—particularly the phenomenon of delayed disclosure, and her opinions that coaching to produce false allegations would be difficult and was "probably rare," those elements of her testimony not cumulative of Wiecken's. With the advantage of review of the record on appeal and oral argument, we now view any contrary suggestion from *Reyna*'s complimentary citation of the Court of Appeals decision in this case as hasty. It is true that Robbins' training and experience had exposed her to many children who *alleged* sexual abuse. But we have no information about how often her determinations as a "fact-finder" of the existence of abuse were confirmed by other evidence and/or later examinations or proceedings. Although she may be well qualified to conduct interviews as part of an interdis-

ciplinary team including police and prosecutors, there is no question that she is neither statutorily qualified nor licensed to diagnose any particular interview subject as a trauma victim suffering from any particular psychological or psychiatric malady. Should she nevertheless be permitted to testify as an expert on the characteristics of such victims in general and their patterns of disclosure? None of our previous cases allowing such testimony has allowed it from a witness with Robbins' background, even when the testimony stopped short of making a diagnosis of a particular alleged victim. See, *e.g.*, *McIntosh*, 274 Kan. at 955-59 (licensed clinical social worker); *Plaskett*, 271 Kan. 995 (social workers); *Reser*, 244 Kan. at 309-15 (social worker with master's degree, recognized expertise on child sexual abuse); *McQuillen*, 239 Kan. 590 (psychiatrist). For us, the doctrinal extension on which the State relied is a bridge too far. Although Robbins possessed certain "knowledge, skill, experience or training" not possessed by jurors, and related to *children who allege* sexual abuse, the State did not demonstrate that she possessed any of these qualifications related to *child victims* of sexual abuse. Robbins could talk about the child accuser interview protocol from a position of superior knowledge, but not about the characteristics of child abuse victims nor the frequency of their inventions or mistakes. The admission of Robbins' testimony as an expert on the common characteristics of child abuse victims, including delayed disclosure and piecemeal disclosure and her opinions about the difficulty and rarity of coaching children to make false allegations was an abuse of discretion, based as it was on an erroneous legal interpretation of K.S.A. 60-456(b) and our prior case law. See *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010) (legal error can lead to abuse of discretion).

Having determined there was error, we move to the question of harmlessness. Unless we deem the error to have affected Gaona's substantial rights, K.S.A. 60-261 does not require reversal of his convictions. Although the type of erroneously admitted testimony we disapprove of today may be unduly prejudicial in certain cases, the State can carry its burden to show harmlessness here. M.L.'s allegations against Gaona were not merely corroborated by her repetition of them to various listeners. They were corroborated by

her brother's observations and unprompted disclosure. They were corroborated in part by the SANE physical observation. They were at least marginally corroborated by the testimony of the sheriff's employees who found the pornographic videotapes. Reversal is not required, despite Robbins' testimony exceeding the boundaries set by her qualifications.

### Attempted Aggravated Criminal Sodomy Instructions on Counts Two and Seven

At trial, Gaona requested lesser included attempt instructions for the rapes charged in Counts One and Three, but he did not request lesser included attempt instructions for the aggravated sodomies charged in Counts Two and Seven. His claim in this appeal that failure to give the attempted aggravated sodomy instructions necessitates reversal of his Count Two and Seven convictions is governed by the clearly erroneous standard. See K.S.A. 22-3414(3). That standard is met only if the instructions were supported by the evidence and we are firmly convinced that, had the instructions been given, there was a real possibility the jury would have returned different verdicts on those counts. *State v. Simmons*, 282 Kan. 728, 741, 148 P.3d 525 (2006) (citing *State v. Boone*, 277 Kan. 208, 220, 83 P.3d 195 [2004]). Omission of an attempt instruction cannot be labeled erroneous, not to mention clearly erroneous, unless there is "some evidence that would reasonably justify . . . conviction[s]" of attempted rather than completed crimes. See *State v. Foster*, 290 Kan. 696, 710, 233 P.3d 265 (2010) (citing K.S.A. 22-3414[3]; *State v. Engelhardt*, 280 Kan. 113, 134, 119 P.3d 1148 [2005]).

Gaona argues that M.L. told Washburn that Gaona would often "try" to have sex with her and that she alternately forgot whether Gaona's penis touched her or said that it touched her "butt." He also points to M.L.'s inability to remember whether Gaona's finger went inside her "butt" and her testimony that he put his penis in her mouth while her eyes were closed. Finally, Gaona also cites his own testimony about his problems achieving and maintaining an erection. All of this, in his view, made this a "close case," and the jury's decision to acquit him on three counts further demonstrates

that "[a] properly instructed jury could easily have convicted Mr. Gaona of the lesser included offenses."

The State responds that M.L.'s testimony supported only completed sodomies and that Gaona's theory of the case was that "none of these acts occurred," not that the acts charged in Counts Two and Seven were unsuccessfully attempted.

The Court of Appeals agreed with the State's view of the record. "Although M.L.'s testimony was inconsistent at times, the jury was simply not presented with evidence that Gaona tried but failed to complete the crime of aggravated criminal sodomy." *Gaona*, 41 Kan. App. 2d at 1072. Quoting this court's decision in *State v. Gibbons*, 256 Kan. 951, 955, 889 P.2d 772 (1995), the Court of Appeals concluded that lesser included offense instructions were not necessary because " 'all of the evidence taken together shows that the offense, if committed, was clearly of the higher degree.' " *Gaona*, 41 Kan. App. 2d at 1072.

Aggravated criminal sodomy is sodomy with a child under 14 years of age. K.S.A. 21-3506(a)(1). Sodomy is defined as "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object . . . ." K.S.A. 21-3501(2). Attempt is defined as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a).

At trial, Gaona categorically denied rape, aggravated criminal sodomy, *and* the attempt of either offense during his testimony. Gaona testified that he never attempted to put or actually put his penis in M.L.'s vagina, anus, or mouth. In contrast, M.L. answered "Yes" when asked if Gaona's doinkey touched her "butt." She also answered "Yes" when asked if Gaona's "doinkey" was put in her mouth and further testified that she "told him to quit." SANE Washburn testified that M.L. told her: "He put his thing up my butt." M.L.'s testimony that she "forgot" whether Gaona's finger penetrated her "butt" is not logically or legally equivalent to testimony that the penetration was attempted unsuccessfully.

Again, if "all the evidence taken together shows that the offense, if committed, was clearly of the higher degree, instructions relating to a lesser degree of the offense are not necessary." *State v. Dixon*, 279 Kan. 563, 573, 112 P.3d 883 (2005), *overruled on other grounds by State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010). Here, the evidence on Counts Two and Seven supported one of only two potential outcomes: the completed offenses occurred or they did not. The jury had the opportunity to believe Gaona and acquit or to believe the incriminating testimony against him and find Gaona guilty of aggravated criminal sodomy. See *Simmons*, 282 Kan. at 742-43. There was not a real possibility that the jury would have convicted Gaona of attempted aggravated sodomy on either Count Two or Count Seven, and he is not entitled to reversal of his convictions on those counts.

*Exclusion of Gaona's Medical Records*

Whether evidence has been properly excluded by the district court under the rules of evidence involves a multistep analysis. This court has explained:

"We review the exclusion of evidence first by determining whether the evidence is relevant. K.S.A. 60-401(b) defines relevant evidence as 'evidence having any tendency in reason to prove any material fact.' This definition encompasses two components: (1) whether the evidence is probative; and (2) whether it is material. *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 (2009); *State v. Henson*, 287 Kan. 574, 578, 197 P.3d 456 (2008). Probative evidence is evidence that 'furnishes, establishes or contributes toward proof.' *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131, 955 P.2d 1189 (1998). Whether evidence was probative is reviewed under an abuse of discretion standard. *Dixon*, 289 Kan. at 69. Material evidence goes to a fact at issue that is significant under the substantive law of the case. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). The determination of whether evidence is material is reviewed under a de novo standard. *Dixon*, 289 Kan. at 70." *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010).

If the evidence is relevant,

"the evidentiary rules governing admission or exclusion of evidence are applied as a matter of law or in the exercise of judicial discretion, depending on the applicable rule. But, if the adequacy of the legal basis is questioned, appellate courts review this question de novo. *Dixon*, 289 Kan. at 70; *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006)." *Martinez*, 290 Kan at 1009.

Unless a defendant's due process rights are implicated, a district court's exclusion of evidence as a permitted sanction because of a party's failure to comply with discovery under K.S.A. 22-3212(g) will be reviewed on appeal for an abuse of discretion. *State v. Johnson*, 286 Kan. 824, 833, 190 P.3d 207 (2008).

Erroneous exclusion of evidence also is subject to an analysis for harmlessness under K.S.A. 60-261. *State v. Shadden*, 290 Kan. 803, Syl. ¶ 18, 235 P.3d 436 (2010).

In this case, the parties each requested discovery from the other well before trial. The State's request under K.S.A. 22-3212 specifically sought any "medical records . . . which the Defendant intends to produce at trial." Nevertheless, Gaona produced no medical records to the State until approximately 2 hours before he sought to introduce them at trial. The State objected. Gaona's counsel, who sought to admit the records with no supporting foundation or medical testimony, said the records had not been produced for the State earlier because a final decision had not yet been made on whether to seek their admission. The trial judge excluded the records. Thus the evidence at trial on Gaona's prostate problem and related erectile dysfunction was limited to his testimony and his wife's confirmation of her awareness of the issue.

Gaona argues that the exclusion of the medical records was fatal to his defense; "the exclusion of evidence that forms an integral part of the defendant's theory of the case violates the defendant's right to a fair trial." *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003); *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297(1973). But the State accurately points out that "[t]he defendant's right to present a defense is subject to the rules of evidence and caselaw on the subject." *State v. Bornholdt*, 261 Kan. 644, 932 P.2d 964 (1997). In addition, in the State's view, the trial court did not prevent Gaona from presenting his medical issues, only his medical records, which the district court was entitled to do in its discretion based on relevance, lack of foundation, and violation of K.S.A. 22-3212.

The Court of Appeals concluded the district court did not err in excluding the medical records, stating that "K.S.A. 22-3212(g) gives the district court authority to prohibit a party from introducing

evidence when discovery rules have been violated . . . [and] Gaona has failed to show that the medical records were relevant, material, or probative." *Gaona*, 41 Kan. App. 2d at 1074. The Court of Appeals emphasized the late production of the records and observed that they included "a host of irrelevant information" unconnected to Gaona's claim of erectile dysfunction. *Gaona*, 41 Kan. App. 2d at 1074. Finally, the Court of Appeals also held that Gaona "cannot establish that he was prejudiced" because he was allowed to testify about his erectile dysfunction. *Gaona*, 41 Kan. App. 2d at 1074.

Although the medical records at the heart of this issue are not included in the record on appeal, we can safely agree with the Court of Appeals that Gaona's argument lacks merit. There were multiple sound legal reasons for the district judge's decision to exclude the records: among them, Gaona failed to lay a foundation for the records; Gaona failed to demonstrate the relevance of many of the records; the contents of the records constituted inadmissible hearsay for which Gaona failed to assert on applicable exception; and the sanctions available to the district judge for Gaona's violation of reciprocal discovery included exclusion. Furthermore, Gaona's due process right to present a defense was not implicated, as he was free to present his own testimony about his prostrate problem, with corroboration of its existence from his wife. Thus, even if the exclusion had been error, the State could carry its burden to demonstrate that it was harmless. See *State v. McCullough*, 293 Kan. 970, 270 P.3d 1142 (2012). It was harmless under K.S.A. 60-261.

*Viewing of Pornographic Movies as K.S.A. 60-455 Evidence*

"When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006). If a party fails to make a specific contemporaneous objection to the admission of evidence or testimony at trial, objection to that evidence or testimony is not preserved for appeal. *State v. King*, 288 Kan. 333, 341-42, 344, 204 P.3d 585 (2009).

Before trial, Gaona moved in limine to preclude the State "from offering, introducing, displaying, exhibiting, referring to, or men-

tioning in the presence of the jury any prior crimes alleged or proven as having the Defendant involved." Gaona also moved to preclude "the introduction of any evidence of other crimes or bad acts pursuant to K.S.A. 60-420, 60-241 and 60-422" and further requested "that the Court admonish the State that all witnesses testifying on its behalf be directed to not violate this Order." The record on appeal does not show the district court's ruling on these motions.

At trial, the following exchange occurred between the State and M.L.:

"Q: Did you watch a movie with [Gaona] that had naked people?
"A: Yes.
"Q: And where did you watch that?
"A: In my mom's room."

On cross-examination, the following exchange occurred:

"Q: Now, did you only watch the naked people movie one time?
"A: Yes."

M.L.'s mother, R.G., also testified at trial that M.L. told her she had seen a pornographic movie. Several members of the Finney County Sheriff's Office also testified about seizing pornographic videos. One of them testified that R.G. had told her that M.L. alleged Gaona watched pornographic videos with her. Eight exhibits consisting of four DVD boxes and four DVDs were admitted into evidence.

Gaona did not object at trial to this evidence. In particular, he did not challenge its admission as inappropriate under K.S.A. 60-455, which governs the limitations applicable to evidence of other crimes and civil wrongs.

In reaching its decision, the Court of Appeals first noted that Gaona did not specifically mention the pornographic movies in his pretrial motion in limine. *Gaona*, 41 Kan. App. 2d at 1075. Further, "Gaona did not object to the admission of or testimony about the movies at trial. In fact, defense counsel asked . . . about the movies during cross-examination." *Gaona*, 41 Kan. App. 2d at 1075. Citing K.S.A. 60-404 and this court's decisions in *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006), and *King*, 288 Kan. at 341, the

panel held Gaona's "failure to make a timely and specific objection" barred review on appeal. *Gaona*, 41 Kan. App. 2d at 1075.

We agree with the panel. As we have repeatedly held: "A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal." *Anthony*, 282 Kan. at 206 (citing *State v. Diggs*, 272 Kan. 349, 365, 34 P.3d 63 [2001]); see also *King*, 288 Kan. at 341-42 (contemporaneous-objection rule codified in K.S.A. 60-404 provides timely, specific objection to evidence at trial required to preserve issues arising from admission). The contemporaneous objection rule applies to evidence alleged to be admitted in violation of K.S.A. 60-455. *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006). We therefore do not reach the merits of this issue.

*Timing of Admission of Victim's Prior Consistent Statements*

The admission of prior consistent statement testimony is generally reviewed for an abuse of discretion. *State v. Whitesell*, 270 Kan. 259, 289, 13 P.3d 887 (2000). However, if a party fails to make a specific contemporaneous objection to the admission of testimony, objection to that testimony is not preserved for appeal. *King*, 288 Kan. at 341-42.

Gaona challenges the State's introduction of prior consistent statements of M.L., through other witnesses testifying before M.L. He acknowledged that no contemporaneous objection on this ground was lodged at trial and urges us to address the merits of the issue to avoid a denial of his fundamental rights.

Again, our recent cases have emphasized the need for a contemporaneous and specific trial objection to preserve an argument against the admission of evidence. See *State v. McCaslin*, 291 Kan. 697, 704-09, 245 P.3d 1030 (2011); *State v. Dukes*, 290 Kan. 485, 489-90, 231 P. 3d 558 (2010); *King*, 288 Kan. at 349. Although preservation is a prudential rather than jurisdictional obstacle to appellate review, see *State v. Hall*, 292 Kan. 862, 868, 257 P.3d 263 (2011) (purely prudential reluctance to reach an issue not presented in district court), we see no potential for denial of Gaona's fundamental rights in this instance. As the State has pointed out, exceptions to the rule that prior consistent statements must not be

introduced into evidence before live testimony by the declarant have been made in past prosecutions for sexual assaults. See *State v. Kackley*, 32 Kan. App. 2d 927, 934-36, 92 P.3d 1128, *rev. denied* 278 Kan. 849 (2004); *State v. Washington*, 226 Kan. 768, 770-71, 602 P.2d 1377 (1979). In addition, prior consistent statements of sexual assault victims may be viewed as independent, corroborating evidence in favor of the State. See *State v. Martinez*, 290 Kan. 992, 1001, 236 P.3d 481 (2010). We thus do not reach the merits of this issue.

*Cumulative Error*

Cumulative error requires reversal of a defendant's conviction "when the totality of the circumstances substantially prejudiced defendant and denied the defendant a fair trial." *State v. McCaslin*, 291 Kan. at 732 (citing *State v. Sharp*, 289 Kan. 72, 106, 210 P.3d 590 [2009]). Reversal for cumulative error is not required if the evidence against a defendant is overwhelming, *McCaslin*, 291 Kan. at 732 (citing *State v. Reid*, 286 Kan. 494, 523-24, 186 P.3d 713 [2008]), and the existence of a single error "is insufficient to accumulate" under the cumulative error doctrine. *State v. Leaper*, 291 Kan. 89, 107, 238 P.3d 266 (2010) (citing *State v. Houston*, 289 Kan. 252, Syl. ¶ 14, 213 P.3d 728 [2009]).

Although the Court of Appeals previously identified an error in instruction on Count Three that requires reversal of one of Gaona's rape convictions, and we have identified an error in admission of portions of Robbins' expert testimony, we are not persuaded that the totality of the circumstances before us substantially prejudiced Gaona and denied him a fair trial overall. As earlier discussed, the expert testimony error was, in context, harmless. And the harm from the instruction error identified by the Court of Appeals is already being corrected. No cumulative error requires reversal of Gaona's three remaining convictions.

*Sentence to Highest Number in Grid Block*

"Construction of the [Kansas Sentencing Guidelines Act] and determination of the constitutionality of its provisions are questions of law" over which an appellate court has unlimited review. *State*

*v. Johnson,* 286 Kan. 824, 842, 190 P.3d 207 (2008) (citing *State v. Davis,* 275 Kan. 107, 124, 61 P.3d 701 [2003]; *State v. Ivory,* 273 Kan. 44, 46, 41 P.3d 781 [2002]). "A statute must clearly violate the constitution before it may be struck down" and an appellate court " 'not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute.' [Citation omitted.]." *Johnson,* 286 Kan. at 842-43.

At the time of sentencing, Gaona had a criminal history score of "I." Gaona was sentenced to the highest number in the grid box for each crime of conviction. He argues that "[b]y imposing the aggravated sentence on each count without putting the aggravating factors to a jury, the district court violated [his] rights under the Sixth and Fourteenth amendments," citing *Cunningham v. California,* 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435(2000).

We have repeatedly rejected this argument. We do not see it differently now. See, *e.g., Johnson,* 286 Kan. 824, Syl. ¶ 5.

The judgment of the Court of Appeals affirming the judgment of the district court in part, reversing in part, and remanding, is affirmed.

MORITZ, J., not participating.

DANIEL L. MITCHELL, District Judge, assigned.