NOT DESIGNATED FOR PUBLICATION

No. 126,455

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CLAUDE RAFEAL KEARSE,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Submitted without oral argument. Opinion filed May 23, 2025. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ISHERWOOD, P.J., BRUNS and GARDNER, JJ.

PER CURIAM: Claude Rafeal Kearse appeals his jury conviction of the second-degree murder of Darius Calvert. Kearse raises two evidentiary challenges. But finding one harmless and finding the other unpreserved, we affirm.

*Factual and Procedural Background*

In the spring of 2019, Calvert was reported as a missing person. As law enforcement gathered information, that missing person case changed into a homicide

1

investigation and led law enforcement to Caitlin Holladay. At the time of Calvert's disappearance, and for the past eight or nine years, Casey Shelman had stayed on and off with Holladay at her home. Around 6 a.m. on April 27, 2019, Calvert, who was a friend of Holladay's, came to her house and asked to rest there. Holladay let Calvert in, and he curled up on the couch with Shelman, who was sleeping. Holladay returned to her room to sleep.

The next day, Holladay woke up around noon. She went out to the living room and found Shelman and Calvert still there. According to Holladay, the night before, Shelman's gun was sitting on top of her purse, next to the couch, and Holladay had asked her to put it away. But shortly after waking, Shelman became "irate," and told Holladay that she could not find her handgun. Shelman "tore apart the house" looking through everything for her gun. Shelman never found her gun and left the house around 2 p.m., still upset. Holladay and Calvert hung out at her house all afternoon, listening to music and using methamphetamine. Around 9 p.m., Holladay and Calvert went to sleep.

Around 2:45 a.m. the next day, Holladay was awakened by a "[v]ery loud thud." She went into the living room and saw several people in her house whom she did not expect to be there, including the defendant. Most of these unexpected people in Holladay's home had guns. Holladay said the mood in the living room was tense. A couple of people were confronting Calvert about Shelman's missing gun. At some point, Holladay heard Calvert admit he had taken Shelman's gun. Holladay had not seen Calvert with a gun, had no reason to believe that Calvert had taken the gun, and did not know whether he had actually taken it. Frightened by all the guns, Holladay retreated to her bedroom. She could hear loud talking and heard a male ask: "'Where's the gun at?'" Shelman came into Holladay's room and spent a few minutes trying to calm her down.

Shelman then went into the bathroom, located directly across from Holladay's bedroom. Kearse, whom Holladay had previously seen with a gun, joined Shelman in the

2

bathroom and the two stayed there for about five minutes with the door open. Holladay heard Shelman tell Kearse, "kill him." She testified she was "95 percent sure" that is what she heard Shelman say to Kearse. Holladay then saw Kearse leave the bathroom and heard seven gunshots "ring out," but she did not see who had fired the gun. Holladay immediately went into the living room and saw Calvert "fall to the floor as he grabbed his chest," and saw everyone fleeing out the front door.

Holladay went outside onto her front porch and yelled for Shelman. She testified that she was in shock, she had never witnessed anything violent before, and Shelman was like a child to her. After Holladay screamed for Shelman, Shelman and Kearse came around the corner of her house and reentered it. Everyone else that was present left, but Holladay did not know where they had gone. Holladay testified that Kearse asked her if there was anything in her house without her DNA on it. She replied "no, this is my home. Everything has my DNA on it." Kearse then grabbed a blanket off Holladay's couch and covered up Calvert's body.

Holladay, Shelman, and Kearse then left the house and walked down the street. Holladay initially followed Shelman and Kearse, but decided she would see if her friend, Jake Wyatt, was home so she could go to his house. Holladay called Wyatt for a ride. Wyatt did not know Shelman or Kearse. He picked the three up and they drove to near 29th Street and Burlingame Road in Topeka. Holladay said she was going to stay with Wyatt, so before Holladay left with him, Kearse took Holladay's phone and house keys and told her that she could tell Wyatt what happened. Holladay left without Shelman and Kearse.

Holladay then went with Wyatt back to his house, and she told him what had just happened—"Bubda had killed Darius [Calvert]." Wyatt told her that she did the right thing by calling him to get her and then left for work in his car around 5 a.m. He left his phone and truck keys with Holladay. Holladay stayed at Wyatt's house for six or seven

3

hours before leaving for another friend's house. When she arrived there, she found all the people who had been at her house earlier that morning when Calvert was shot. Preston Patterson gave Holladay back her keys and told her she could leave. Holladay left with Shelman and returned to Wyatt's house.

Around 5 p.m., Holladay returned to her house with Shelman. Kearse also arrived at the house at about the same time. Holladay was not expecting him. Calvert's body was gone and her home looked just as it had before he was shot in her living room. She noticed a few blood drops on the floor. Holladay testified that Kearse held her at gunpoint and made her clean up the remaining blood and burn the paper towels she used to do so in the firepit in her backyard.

Holladay stated she did not call the police to report Calvert's death because she was scared for her own life. She also did not speak to the police before trial for the same reason. She spoke only with the prosecutor. Several weeks later, Calvert was reported as a missing person. By June or July 2019, the case turned from a missing person investigation into a homicide investigation after law enforcement received information through various interviews that Calvert had been murdered at Holladay's house.

In July 2019, law enforcement executed a search warrant at Holladay's house. While doing so, officers used Bluestar, a chemical that indicates a strong likelihood of the presence of blood when it illuminates blue. The Bluestar revealed blue spots on the floor and wall in the corner of her living room. Law enforcement took swabs of the spots, which were sent off for additional testing. The results confirmed that the swabs were blood. One had a mixture of DNA from two people. The major profile from that swab was consistent with Holladay and the partial minor profile was insufficient for comparison. The other swab had a partial mixed profile which was also insufficient for comparison. Both had a partial male DNA haplotype, which means there was male DNA present, but that DNA was not able to be attributed to any specific individual.

4

Three days after this July search, Kearse came over to Holladay's house and told her, "There's a big dead snake in your backyard, Cat. We're going to have a heart to heart," and then kissed her on the forehead. Holladay testified she did not know what Kearse meant by this interaction.

During his investigation, the lead detective on the case, Jared Strathman, compiled a potential list of people who were present at Holladay's house on the night of Calvert's murder. According to Strathman, one name that kept being mentioned was "Bubda," which is Kearse's nickname. Most of the people on his list would not speak to him about the events of that night, including Holladay. Strathman spoke with Shelman a few times and eventually also interviewed Malachi Cousin, Marlando Johnson, and Wyatt.

During interviews with law enforcement, Cousin admitted that he went to Holladay's house with Shelman and Kearse on the night of Calvert's murder. He stated he was outside, and while outside he heard four gunshots. Johnson told Strathman he knew nothing about the murder.

Wyatt told Strathman he did not personally know Shelman, Calvert, or Kearse, but he did know of someone named "Bubda," and he testified to the same. Wyatt confirmed that Holladay called him on the night of the murder for a ride and he picked up her and two other people. According to Wyatt, he drove to somewhere off Burlingame Road, all three people got out of his car, the two people he did not know remained there, and Holladay got back in his vehicle and asked if she could spend the night with him. He took Holladay back to his house, let her sleep on his couch, and got ready for work. Wyatt left Holladay the keys to his truck and went to work in his car. He said that Holladay did not tell him anything about why she needed to be picked up.

Strathman also interviewed Kearse during his investigation. During that interview, Kearse stated he knew who Calvert was but denied being involved in the murder. But

5

during that interview, Kearse made a statement that stood out to the detective—"There's nothing worse than to kill somebody and then look at my daughter."

Detective Victor Riggin interviewed Justin Boston as part of the investigation. According to Riggin, the following occurred in that interview. Boston said that in August or September 2019, Holladay told him that someone named Darius was shot inside her house. Boston did not know Darius' last name but knew his nickname was "Boots." Boston also said that he saw "Bubda" a few weeks before Holladay told him this information, and Boston said that when he asked "Bubda" where "Boots" was "Bubda" replied that he had killed him. Boston was shown pictures and identified "Bubda" as Kearse and "Boots" as Calvert. At trial, Boston stated he did not recall his conversation with police because he was under the influence of drugs and alcohol. Yet Riggin testified that during his interview with Boston he had not observed any signs he was under the influence of drugs or alcohol.

Nearly a year after the first search, in May 2020, law enforcement executed another search warrant at Holladay's house. During that search, law enforcement removed several of the floorboards in the living room and the foam underlaying them. They found discoloration around the edges and on the backside of the floorboards. They used Bluestar on the back of the floorboards, which indicated that blood was likely present. Law enforcement took swabs of the spots and sent them off for additional testing. The results of this testing indicated that the swabs were blood. One swab had no DNA profile. Other swabs had partial DNA profiles that had insufficient quality for comparison or had mixed DNA profiles that had such a high number of contributors that they were not suitable for comparison. Additionally, the foam underlayment had a mixed DNA profile from at least three people, one of which was consistent with Holladay and the others from unknown individuals.

6

In June 2020, about 25 miles south of Topeka in Osage County, an individual found a possible human bone while walking on a trail that led down to a fishing creek. In November 2020, kayakers found additional possible human remains and clothing on a creek bank near where the first bone was found. Upon each discovery, the Osage County Sheriff's Office documented the initial location of the suspected bones and collected those remains. Those bones were sent for testing. The lab identified the first bone found as a human humerus bone and the second bones found as four pieces of human vertebra. The vertebra tested consistent with the DNA profile from the humerus bone, and the humerus bone's DNA sample was consistent with Calvert.

Based on the investigation, Kearse was charged with premeditated first-degree murder. At his jury trial, Arturo De La Cerda testified. He acknowledged that he was testifying so the prosecutor's office would notify the sentencing judge in his other pending cases of his cooperation in the Kearse case. De La Cerda was an inmate at the Shawnee County jail and was housed with Kearse in the spring of 2022. He testified that Kearse told him he was charged with murder and the two had conversations about the facts of Kearse's case. The following happened in their first conversation. Kearse told De La Cerda that "he had killed Boots. That it happened over in Oakland. At a girl named Cat's house." According to De La Cerda, Kearse said he shot "Boots" multiple times "because of a pistol—stolen gun." According to De La Cerda, Kearse also said that "Boots had had sex with [Shelman] and that he found out about it and since then he had been looking for a reason to kill him." De La Cerda did not know "Boots" or Shelman.

De La Cerda testified that Kearse told him:

"[H]e had showed up to the house on [XXXXX] Street. That Boots was on the couch. That he had a confrontation with him and an argument. And then he went to the bathroom. And when he was coming out of the bathroom he had a conversation with

7

[Holladay] and [Holladay] had said to take care of the situation. And he said after that, that is when he shot Boots multiple times."

The street mentioned matched the street Holladay's house was located on. De La Cerda continued, testifying that Kearse told him "he made [Cousin] go outside before the shooting. And he also said that Code Red [a nickname for Cody Cunningham] and [Patterson] helped him with the body. And [Shelman] kept a look out. And that the body was discarded out in Osage County." He testified he did not know these people.

De La Cerda also testified that Kearse commented to him that he would "beat" his charges because "it's about what they can prove." Kearse also told De La Cerda he "wanted to disappear" a detective and a prosecutor involved in the case "because they were the ones that are on his bumper" and that "this time they wouldn't find any bones." In their second conversation, Kearse told De La Cerda that he had forced Holladay to clean up the blood.

Cousin also testified at trial. He testified that he went to Holladay's house with "Bub," and that it was "Bub's" idea to go to the house and he did not know why they were going there. Around 10:30 or 11:30 p.m., they walked into Holladay's house and "Boots" and Shelman were there. About 20 minutes later, three other people arrived, including Cunningham and Patterson. He saw Cunningham with a handgun. Cousin testified that Patterson and "Boots" began to argue about a gun that Calvert borrowed and did not give back and then a fight broke out. He agreed that everyone at the house was "hyped up on drugs" that night.

Cousin testified he did not see who shot Calvert. He was on his phone with his girlfriend when the fight broke out, and Cunningham told him to get off the phone. Cousin testified he felt disrespected by this request, so he walked outside the house to finish his conversation. He finished his call and then got into a truck. While sitting in the

8

truck, he heard four gunshots in rapid succession "coming out of the house." Cousin remained in the truck, and then Cunningham and Patterson walked out of the house and got in the truck, and the three left.

Cousin testified he never went back to the house and never saw "Bub" after that. He stated he was a heavy methamphetamine user at the time and did not call the police because of his state of mind and drug use. He also stated that he chose to testify at Kearse's trial in hopes the State would advise the judge of his cooperation in another pending case.

After deliberations, the jury convicted Kearse of second-degree murder, a lesser-included offense. The district court sentenced Kearse to 653 months in prison.

Kearse now timely appeals, raising three arguments. First, he argues that the district court abused its discretion when it admitted evidence that Holladay heard Shelman tell Kearse to "kill him," referring to Calvert, because this statement was hearsay. Second, Kearse argues that the district court abused its discretion by admitting De La Cerda's testimony that Kearse would "disappear" a detective and the case's prosecutor after he was acquitted and that "this time they wouldn't find any bones." Kearse contends this statement was evidence of another crime and was inadmissible under K.S.A. 60-455. Finally, Kearse argues that cumulative error deprived him of his right to a fair trial.

*Did the District Court Improperly Admit Hearsay Evidence?*

First, Kearse argues that the district court abused its discretion by admitting evidence that Holladay heard Shelman tell Kearse to "kill him," referring to Calvert, because it was hearsay. The State counters that the admitted evidence was not hearsay

9

because it was a directive and not a declaration of fact. Alternately, the State argues even if the statement was hearsay and erroneously admitted that the error was harmless.

Before addressing Kearse's hearsay argument, we focus on the facts surrounding Kearse's counsel's objection. At trial, Holladay testified that she saw Shelman and Kearse go into the bathroom and talk for several minutes. The State then asked if she could hear what the two were saying. Kearse's counsel objected, arguing that anything Holladay heard Shelman say would be hearsay because Shelman had not been served with a subpoena and would not be testifying at trial. The State agreed that Shelman had not been subpoenaed and would not be testifying. But the State disagreed that the statement was hearsay. It responded that the only statement it planned to admit was that Holladay heard Shelman tell the defendant to go kill Calvert and argued that this statement was not hearsay because it was not offered for the truth of the matter asserted. Rather, it was offered to show that the instruction had been given and then was followed. The State contended that the conversation was offered only to show the effect on the listener, Kearse. Defense counsel argued that Shelman's direction to Kearse to kill the victim, followed by saying that Kearse did so, was offered for the truth of the matter asserted.

The district court overruled the objection, finding that evidence of an out-of-court statement that is not offered to prove the truth of the matter stated is not hearsay under K.S.A. 60-460.

Holladay then testified as follows:

> "[THE STATE]: Was there anything that Casey said to Claude that you did hear?
> "[HOLLADAY]: To kill him. To kill Darius.
> "[THE STATE]: Do you know the exact words that she used?
> "[HOLLADAY]: Kill him."

10

With all these facts in mind, we now turn to resolving Kearse's argument on appeal.

"The admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value." *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Appellate courts apply different standards of review depending on the consideration at issue.

Whether a particular legal principle or statutory rule governs the admission of specific evidence is a question of law subject to de novo review. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018). But appellate courts typically review a trial court's determination that hearsay is admissible under a statutory exception for an abuse of discretion. *State v. Jones*, 306 Kan. 948, 957, 398 P.3d 856 (2017). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). Kearse, as the party asserting the district court abused its discretion, bears the burden of showing such an abuse of discretion. See *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022).

K.S.A. 60-460 defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 60-460 requires that hearsay statements be excluded unless the statement qualifies under a statutory exception found therein. "The theory behind the rule excluding hearsay evidence is that the credibility of the declarant is the basis for the reliability of the statement, and the declarant must therefore be available for cross-examination." *State v. Seacat*, 303 Kan. 622, 635, 366 P.3d 208 (2016).

But out-of-court statements that are not offered to prove the truth of the matter asserted are not hearsay. *State v. Sinnard*, 318 Kan. 261, 287, 543 P.3d 525 (2024); *State v. Vontress*, 266 Kan. 248, 253, 970 P.2d 42 (1998) (holding if out-of-court statement is offered "merely for the purpose of establishing what was then said, and not for the purpose of establishing the truth of the statement, the statement is not hearsay"). If the non-hearsay statement is relevant, it is admissible through the person who heard it. *State v. Harris*, 259 Kan. 689, 698, 915 P.2d 758 (1996); see also *State v. McKissack*, 283 Kan. 721, 736, 156 P.3d 1249 (2007).

When a statement is offered to show the effect on the listener it is not considered hearsay. See *State v. Becker*, 290 Kan. 842, 847, 235 P.3d 424 (2010) (holding statements offered into evidence not to prove the truth of the matter asserted but "to show their effect on the listener" do not constitute hearsay); *State v. Ninci*, 262 Kan. 21, 51, 936 P.2d 1364 (1997). For example, when a declarant tells a police officer someone in a building is in danger, and the officer makes a warrantless entry, the statement to the officer that someone is in danger is not hearsay if offered to prove the officer reasonably believed an emergency existed. *State v. Jones*, 24 Kan. App. 2d 405, 408-09, 947 P.2d 1030 (1997); see *Becker*, 290 Kan. at 847; *State v. Morris*, No. 125,537, 2024 WL 3219311, at *7 (Kan. App. 2024) (unpublished opinion).

Kearse points to an exception to this rule: that while a statement offered to show the effect on the listener is not hearsay, when such a statement directly incriminates the defendant, it is inadmissible absent a hearsay exception. *State v. Johnson*, 253 Kan. 75, Syl. ¶ 7, 853 P.2d 34 (1993); *Jones*, 24 Kan. App. 2d at 409. "A statement directly incriminates the defendant when it tends to identify the defendant and establish the defendant's guilt. See *State v. Rowe*, 252 Kan. 243, 247, 843 P.2d 714 (1992)." *State v. Aldridge*, No. 81,680, 1999 WL 35815335, at *2 (Kan. App. 1999) (unpublished opinion).

But this caveat has been applied only when statements of dispatchers, informants, or law enforcement officers are offered to explain the action of an investigating officer. See *Johnson*, 253 Kan. 75, Syl. ¶ 7; *State v. Thompson*, 221 Kan. 176, 179, 558 P.2d 93 (1976); see also *State v. White*, 234 Kan. 340, 346, 673 P.2d 1106 (1983) (statements of dispatchers or informants offered only to explain the action of an investigating officer are admissible, but statements by informant to officer is inadmissible hearsay when statement identifies accused and establishes his guilt). Shelman's statement to Kearse is not a third-party statement to a police officer to explain the officer's conduct in an investigation of a crime. The incriminatory declaration here was not made to a police officer, and Kearse fails to show that this hearsay exception applies more broadly, so we do not apply it.

As the district court found, when a statement is offered to show the effect on the listener it is not considered hearsay. See *Ninci*, 262 Kan. at 51. Additionally, "'[i]f the statement is offered merely to show the fact of its having been made, it is admissible through the person who heard it.'" *State v. Smith*, 271 Kan. 666, 674, 24 P.3d 727 (2001) (quoting 2 Wharton's Criminal Evidence [13th Ed.] § 274). Here, the State explained that it wanted to show the "kill him" directive was made and to show its effect on the listener, whom it identified as Kearse. But Kearse (the listener) was not testifying, Holladay was. Still, the State made a reasoned explanation for why the statement was not hearsay, and the district court may have acted within its discretion in accepting that rationale.

*Any Error Was Harmless*

But even if the district court erred by admitting this statement, we next consider whether the error was harmless under K.S.A. 60-261. *State v. Lowery*, 308 Kan. 1183, 1235-36, 427 P.3d 865 (2018). Under this test, the party benefitting from the error—here, the State—has the burden to show no reasonable probability that the error affected the outcome of the trial, considering the entire record. *State v. Gaona*, 293 Kan. 930, 940,

13

270 P.3d 1165 (2012); see also K.S.A. 60-261 (erroneous admission of evidence is harmless unless it affects the defendant's substantial rights).

The State argues that the error is harmless because it presented ample evidence to establish that Kearse was the person who shot Calvert, other than Holladay's testimony that she heard Shelman tell Kearse to kill Calvert. We agree and summarize some of that evidence here.

First, the jury watched a portion of Kearse's interview with law enforcement during which he made a chilling statement—"There's nothing worse than to kill somebody and then look at my daughter."

Second, Holladay went to Wyatt's house the morning of the crime and told him what had just happened—"Bubda had killed Darius [Calvert]." The bulk of her testimony excluding the hearsay statement provides solid circumstantial evidence that Kearse was the shooter.

Third, Boston testified that around August or September 2019, Holladay told him that "Bubda" had shot Calvert in her house. Boston also testified that he had seen "Bubda" a few weeks before he had talked to Holladay and had asked him where "Boots" (Calvert's nickname) was, and "Bubda" replied that he had killed him.

Fourth, De La Cerda testified in great detail that while housed with Kearse in jail, Kearse told him about shooting the victim. Kearse told him that "he had killed Boots. That it happened over in Oakland. At a girl named Cat's house." De La Cerda testified that Kearse told him he had shot "Boots" multiple times because of a stolen gun and because "Boots had had sex with [Shelman] and that he found out about it and since then he had been looking for a reason to kill him."

14

De La Cerda testified that Kearse told him "he had showed up to the house on [XXXXX] Street," which was the same street that Holladay's house was on. He continued,

> "Boots was on the couch. That [Kearse] had a confrontation with [Calvert] and an argument. And then he went to the bathroom. And when he was coming out of the bathroom he had a conversation with [Holladay] and [Holladay] had said to take care of the situation. And he said after that, that is when he shot Boots multiple times."

De La Cerda continued, "[H]e made [Cousin] go outside before the shooting. And he also said that Code Red and [Patterson] helped him with the body. And [Shelman] kept a look out. And that the body was discarded out in Osage County."

De La Cerda also testified that Kearse commented that he would "beat" the case because "it's about what they can prove." Kearse told De La Cerda that he wanted to "disappear" a detective and a prosecutor involved in the case "because they were the ones that are on his bumper" and said that "this time they wouldn't find any bones." Notably, it was the discovery of Calvert's bones that ultimately led to Kearse's charges in this case. Kearse had also told De La Cerda that he had forced Holladay to clean up the blood.

The jury heard the evidence from all the witnesses and weighed their credibility in reaching a verdict. In closing argument, the State told the jury they had to decide the weight and credit to be given to the testimony of each witness and that it could use common sense and experience in reaching its verdict, and it noted those jury instructions. The State emphasized the jury instruction about informants and told the jury that it "should consider with caution the testimony of an informant who is testifying in exchange for benefits." The State argued that their testimony was supported by other evidence, which made their testimony more credible.

Boston and De La Cerda's motivations were fully explored during their testimonies. Kearse's counsel attacked the credibility of Holladay, Boston, and De La Cerda, both during cross-examination and during closing, and stressed that Kearse's DNA was not found at the scene.

The jury considered the credibility of the witnesses and their motivations in testifying yet still convicted Kearse of the lesser offense of second-degree murder. Ample evidence shows that Kearse shot Calvert, even without Holladay's testimony that she had heard Shelman tell Kearse to "kill him." When reviewing the record as a whole, we find no reasonable probability that the error affected the outcome of the trial considering the entire record. *Gaona*, 293 Kan. at 940. Thus any error in admitting Holladay's statement was harmless.

*Did the District Court Err by Admitting Testimony from De La Cerda About Other Crimes?*

Kearse next argues that the district court abused its discretion by admitting evidence of another crime inadmissible under K.S.A. 60-455—De La Cerda's testimony that Kearse said he would "disappear" a detective and the case's prosecutor after he was acquitted and that "this time they wouldn't find any bones." The State responds that Kearse did not properly preserve this issue for appeal because there was no contemporaneous objection to the testimony and, in the alternative, the statement was not K.S.A. 60-455 evidence and was otherwise relevant.

As discussed above, "[t]he admission of evidence involves several legal considerations: determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value. [Citation omitted.]" *Levy*, 313 Kan. at 237. Appellate courts apply different standards of review depending on the consideration at issue. Yet an evidentiary challenge must be properly preserved for an

16

appellate court to review the admission of the challenged evidence on appeal. See K.S.A. 60-404. We thus first consider if the issue was properly preserved.

Whether a litigant has properly preserved an argument for appeal is a question of law subject to unlimited review. *State v. Campbell*, 308 Kan. 763, 770, 423 P.3d 539 (2018). Additionally, an appellate court need not scour the record to determine whether an evidentiary issue is preserved with an objection below. See *Ellie v. State*, 312 Kan. 835, 839-40, 481 P.3d 1208 (2021).

If a timely and specific objection was not made on the record, K.S.A. 60-404 generally precludes an appellate court from reviewing the evidentiary challenge. *State v. Showalter*, 318 Kan. 338, 345, 543 P.3d 508 (2024). K.S.A. 60-404's timely objection requirement is a procedural bar to appellate review. *State v. Crudo*, 318 Kan. 32, 38, 541 P.3d 67 (2024). That statute provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." K.S.A. 60-404.

The Kansas Supreme Court has interpreted K.S.A. 60-404 to require a contemporaneous objection at trial to preserve an alleged trial error for review. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). A standing objection can also satisfy this requirement. See *Crudo*, 318 Kan. at 38. The *King* court underscored that the Supreme Court strictly enforces the contemporaneous objection rule:

> "[T]he legislature's intent in enacting K.S.A. 60-404 is clear: a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review.

17

"We stress today the importance of this legislative mandate. K.S.A. 60-404 dictates that evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial. Although our past decisions may have relaxed the objection requirement in the evidentiary context, this practice not only has led to confusion as to the standards that should be applied on appeal, but also has de-emphasized the role of counsel at trial and has impaired the gate-keeping function of district courts in this state. More importantly, this practice of reviewing evidentiary questions when no objection has been lodged runs contrary to the legislature's clearly stated intent in K.S.A. 60-404. [Citation omitted.]" 288 Kan. at 348-49.

We acknowledge the requirement for a contemporaneous trial objection is not explicitly stated in the plain language of K.S.A. 60-404. See *State v. Holman*, 295 Kan. 116, 153, 284 P.3d 251 (2012) (Johnson, J., concurring in part and dissenting in part) (stating plain language of statute does not justify "artificial, court-made preservation rule which requires a defendant to reassert an objection which has previously been ruled upon in favor of the State"). But the Kansas Supreme Court "has shown no indication that it intends to deviate from the requirement of a contemporaneous objection at trial in order to preserve an evidentiary issue for appellate review." *State v. Solis*, 305 Kan. 55, 62, 378 P.3d 532 (2016); see *Showalter*, 318 Kan. at 346 (citing *King*). This court is duty-bound to follow the Kansas Supreme Court's holdings absent indication the court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). This contemporaneous objection rule includes contested K.S.A. 60-455 evidence, which Kearse complains of here. See *Solis*, 305 Kan. at 61-62.

We now turn back to the facts here. Before the State called De La Cerda to testify, Kearse's attorney requested a break and a bench conference to discuss the scope of De La Cerda's testimony. Defense counsel wanted to make sure that this witness had been properly admonished not to speak about anything other than the murder in this case and anything surrounding that. The State replied that it intended to ask him about a statement that the defendant made about his confidence in being acquitted in this trial and some

18

plans that he had for after this trial, including a statement that the defendant planned to get rid of one of the detectives who worked the case and the Deputy District Attorney who signed the complaint. Defense counsel replied that the statements could be about another crime—criminal threat. The State responded that the statement was highly relevant because in addition to his stated intent to get rid of those persons, he also said that this time they won't find any bones. And it argued that the statement was not a criminal threat because such a threat could not be a stated intent to do something in the future and had to be made to a specific person, intending to put that person in fear. The district court found the statement relevant here and overruled the "other crimes" objection.

Then, De La Cerda testified:

> "[THE STATE]: . . . did he say anything about his chances in this trial?
>
> "[DE LA CERDA]: He said that he would beat it, because it's not about—it's not what you know, it's about what they can prove.
>
> "[THE STATE]: Okay. And did he say anything about Detective Riggs, about what he was going to do after he beat the trial?
>
> "[DE LA CERDA]: He said he wanted to disappear Detective Riggs and [a prosecutor], because they were the ones that are on his bumper.
>
> "[THE STATE]: Did he give you other details about Detective Riggs and [the prosecutor]?
>
> "[DE LA CERDA]: He just said that this time they wouldn't find any bones.
>
> "[THE STATE]: And this is all in the conversation in the courtyard?
>
> "[DE LA CERDA]: Yes.
>
> "[THE STATE]: In early April?
>
> "[DE LA CERDA]: Yes."

The parties disagree whether this evidence is other crimes evidence subject to K.S.A. 60-455's rules. We liberally assume for the sake of analysis that it is. Still, Kearse's attorney failed to make a contemporaneous objection to its introduction. When

19

De La Cerda testified that Kearse would "disappear" a detective and a prosecutor involved in his case after he was acquitted and this time "they wouldn't find any bones," Kearse did not object.

Kearse acknowledges that he did not object during De La Cerda's testimony but argues that the discussion during the bench conference before De La Cerda's testimony was sufficient to satisfy K.S.A. 60-455's requirement. We disagree. Under *King*'s contemporaneous-objection rule, the discussion at the bench before De La Cerda's testimony was untimely because it was not made when the K.S.A. 60-455 evidence was introduced, nor did counsel request a continuing objection to the evidence. Because Kearse failed to make a contemporaneous objection to the K.S.A. 60-455 evidence at trial, we cannot reach the merits of this issue.

*Does Cumulative Error Deprive Kearse of a Fair Trial?*

Lastly, Kearse argues that cumulative error deprived him of his right to a fair trial. Cumulative trial errors, when considered together, may require reversal of a defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

But the cumulative error rule does not apply when, as here, there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). Thus Kearse's final claim fails.

Affirmed.